**EXHIBIT 20**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CONSOLIDATED ACTION**

| | |
|---|---|
| IN RE: UNIVERSITY OF MIAMI COVID-19 TUITION AND FEE REFUND LITIGATION | CASE NO. 20-60851-CIV-SINGHAL<br>CASE NO. 20-22207-CIV-SINGHAL<br>CASE NO. 20-22316-CIV-SINGHAL<br>CASE NO. 20-22594-CIV-SINGHAL |

---

**EXPERT REPORT OF CHARLES D. COWAN, PH.D.**

**July 15, 2022**

---

**Table of Contents**

I.      Introduction.................................................................................................................2

II.     Professional Qualifications and Compensation ...........................................................3

    A.     Professional Experience .........................................................................................3

    B.     Experience in Academia..........................................................................................4

    C.     Publications.............................................................................................................4

    D.     Professional Societies .............................................................................................4

    E.     Compensation .........................................................................................................5

III.    Methodology to Calculate Damages ...........................................................................5

    A.     Overview of Class Member Damages Calculations.................................................5

    B.     Methodology for Calculation of Tuition-related Damages ....................................8

    C.     Methodology for Calculation of Student Fees-related Damages .......................... 13

IV.    Calculations of Damages for Lead Plaintiffs Ms. Dimitryuk and Ms. Dixon. ........... 16

    A.     Tuition-related Damages for Lead Plaintiff Valeria V. Dimitryuk. ....................... 16

    B.     Tuition-related Damages for Lead Plaintiff Adelaide E. Dixon........................... 18

    C.     Student Fees-related Damages for Lead Plaintiff Valeria V. Dimitryuk. ................. 21

    D.     Student Fees-related Damages for Lead Plaintiff Adelaide E. Dixon. ...................... 23

    V.     Provisional Calculation of Tuition-related Damages for Undergraduate Students in the Putative Class.   24

    VI.    Conclusions.............................................................................................................. 30

I. Introduction

1.  I have been retained by Bursor & Fisher, P.A.; Poulin | Willey | Anastopoulo, LLC; and Hagens Berman Sobol Shapiro LLP; co-counsel for the proposed class in this action against the University of Miami ("Defendant" or "U-Miami").  I was asked to evaluate the loss to students enrolled at U-Miami due to switching from in-person, campus-based educational services to on-line only services during the second half of the Spring Semester offered at U-Miami in 2020.

2.  Further, I was asked to quantify the losses incurred by each student, including prejudgment interest, on classes that were switched from in-person, campus-based services to on-line only for students who contracted for educational services at U-Miami's campus.

3.  This report summarizes analyses I conducted and the conclusions I developed based on these analyses. The materials on which I relied for purposes of this report are listed in Exhibit 3.

4.  As of the date of this report, detailed information has been produced only for Plaintiff representatives Valeria V. Dimitryuk and Adelaide E. Dixon—i.e., Lead Plaintiffs. Detailed information similar to that provided for the Lead Plaintiffs has not been produced for other class members, including any information on fees. My understanding is that, should the class be certified, this information will be made available in production as part of discovery.  In Section III, I provide a framework for calculating both tuition-related and student fees-related damages for each member of the class using a single formula and present these calculations for the Lead Plaintiffs in Section IV.

5.  In Section V, I provide an estimate of tuition-related damages for undergraduate students as a whole, based on information in Plaintiffs' pleadings.  I also rely on information I have been able to gather from public sources, including The National Center of Education Statistics ("NCES") and materials publicly available in U-Miami's website. Finally, I make reasonable assumptions as needed and document these.  I do not offer similar calculations for Graduate

2

Students or with respect to fees because I do not have the necessary information to provide such calculations.

6. I expect to receive more materials through discovery should this class be certified or compelled by the Court as part of the pending discovery dispute. I reserve the right to amend this report when more fulsome information becomes available to me.

## II. Professional Qualifications and Compensation

7. I have over fifty years of experience in statistical research and design. I received my Bachelor of Arts degree in Economics from the University of Michigan, my Master of Arts degree in Economics from the University of Michigan, and my doctorate in Mathematical Statistics from the George Washington University. I currently consult for numerous public and private sector entities on the design, implementation, and evaluation of research, and the synthesis of statistical and sampling techniques for measurement. My professional experience and academic tenure are included in my curriculum vitae, a true and correct copy of which is attached as Exhibit 1.

### A. Professional Experience

8. I have designed numerous large and complex research programs. These include the Post Enumeration Program for the U.S. Census Bureau to evaluate the Decennial Census, the Economic Cash Recovery valuations conducted by the Resolution Trust Corporation ("RTC"), and evaluation studies conducted for the Department of Justice, the Department of Defense, and the Department of the Treasury.

9. From January 2002 to the present, I have been a Member of Analytic Focus LLC. My firm provides analytic services in the public and private sectors. My firm has multiple projects with the federal government involving audits and other review services. The firm helps businesses and

nonprofits optimize their operations and estimate the economic impact of their activities.  Included in the firm offerings are expert witness and consulting services in litigation.  A list of cases in which I have given expert testimony during the previous four years is attached as Exhibit 2.

### B.  Experience in Academia

10. I have taught graduate and undergraduate courses in sampling theory, statistics, and computational methods for analysis.  I recently retired from my position as Professor in the School of Public Health at the University of Alabama at Birmingham.

11. I also served as an Associate Professor of Statistics at George Washington University from 1993 to 1998, served as a Visiting Research Professor at the Survey Research Laboratory of the University of Illinois from 1983 to 1989, and was on the faculty of the School of Public Health at the University of Alabama Birmingham from 2002 to approximately 2017.

### C.  Publications

12. I have co-authored two books: one on evaluation of survey and census methods, and one on econometric measures related to the welfare of the U.S. economy.  I also have written numerous articles on statistical methods, sampling, rare and elusive population research, and optimization techniques.  A listing of these publications is included at pages 4 to 7 of my curriculum vitae, attached as Exhibit 1.

### D.  Professional Societies

13. I am a member of the American Statistical Association and have held memberships in other professional societies.  My positions on professional committees are listed at page 3 of my C.V., attached as Exhibit 1.

E.  Compensation

14. My firm is being compensated for my work on this engagement at the rate of $975 per hour for my time.  The payment of these fees is not contingent on the opinions I express in connection with this engagement.

III. Methodology to Calculate Damages

A.  Overview of Class Member Damages Calculations

15. "Plaintiffs bring this case as a result of Defendant's decision not to issue appropriate refunds for the Spring 2020 semester after canceling in-person classes and changing all classes to an on-line/remote format."[1]  Plaintiffs seek refunds for both tuition- and student fees-related education services that they contracted and paid for but which were not fully delivered by U-Miami.

16. Following the Plaintiffs' pleadings, students contracted with U-Miami for on-campus and in-person education services to be provided during the entire Spring 2020 semester, however, Plaintiffs received the contracted services for only a portion of the semester.

17. Spring 2020 semester at U-Miami started on January 13, 2020, and should have ended on May 6, 2020.[2]  "However, on March 12, 2020, Defendant announced that Spring break was to be extended through March 22, 2020 and classes were to resume on March 23, 2020, but strictly in online/remote/distance learning…"[3]  Thus, for approximately forty-eight percent of the semester

---

[1] Complaint ¶1.
[2] See Complaint ¶¶61 – 62.
[3] See Complaint ¶64.

the tuition-related education services were provided entirely on-line.[4]  Alternatively, U-Miami did provide these services to students as contracted during fifty-two percent of the semester.

18. Overall, my calculation of damages results from comparing the market value of the education services that students contracted with U-Miami for the whole Spring 2020 semester[5] against the market value of the education services they actually received.[6]  Special cases and refunds can be easily accommodated in the damages methodology that I detail below.[7]

19. My calculation of damages is based on splitting the Spring 2020 in two periods: before and after the closure of U-Miami's campus due to Covid. With this split, I then determine and assess the monetary value of tuition- and student fees-related education services that U-Miami actually provided to students in each period.  Prior to the campus closure all contracted education services were offered by U-Miami and are so credited.  After the closure of the campus, U-Miami delivered education services to students that were different from those they contracted.  For instance, all courses were delivered on-line, and labs and other fee-based services were not available.

20. In terms of student fees, for each set of services associated to each at-issue student fee, I expect to receive from the Defendant the proportion of these services that remained available to students during the part of Spring 2020 semester when the campus was closed, so that I can assess

---

[4] See Complaint ¶73.

[5] On-campus and in person education services with access to on-campus education activities and campus facilities.

[6] On-campus and in person education services with access to on-campus education activities and campus facilities during the first part of the Spring 2020 semester, and distance learning without access to on-campus education activities and campus facilities during the second part of the semester.

[7] Students who enrolled in on-line courses in Spring 2020 can be dealt with appropriately; for instance, by not claiming damages for these on-line courses.  Students who withdrew from the university and got refunded will not be included in the calculation of damages or simply get assigned $0 in damages.  In general, all refunds that U-Miami provided to students for contracted services not provided during the time the campus was closed should be accounted for as offsets in the calculation of damages.

the value that was actually received by students from fee-related services during the said period. In addition, for each at-issue student fee, I expect U-Miami to provide whatever amount it refunded to each student.  I will account for these refunds as offsets in the calculation of student fees-related damages.

21. Regarding the tuition paid by students to U-Miami in Spring 2020 semester, it should be noted that, according to Plaintiffs' counselors, the university provided no refund to students, nor did students experience any adjustment to their financial arrangements (including the financial aid they received), even though the university delivered all courses on-line only and closed its campus during the second part of the referenced semester.

22. As a result, in terms of the calculation of tuition-related damages, the main issue is to assess the market value of the courses that U-Miami provided fully on-line (rather than in person as originally scheduled and contracted) to students during the second part of Spring 2020 semester. That is, on-line education without access to on-campus education activities and campus facilities, which, in the but-for world being created, is nearly identical to the education provided by fully on-line programs where, even if the university has a physical campus, enrolled students are scattered across the country (or even overseas) and do not access on-campus education activities and campus facilities.[8]

23. In contrast, in terms of their access to on-campus education activities and campus facilities, other than on-campus face-to-face course lectures, there is not much difference between traditional

---

[8] The distance education that U-Miami provided during the second part of Spring 2020 is similar to that demanded by non-traditional students, who may take classes during evenings, weekends, and on-line, with limited access to on-campus education activities and campus facilities.

students who take some courses on-line throughout their program and those who do not.[9] "Defendant's institution offers both in-person, hands-on programs, and a few fully on-line distance-learning [graduate] programs, which it markets and prices as separate and distinct products."[10]

24. Given that U-Miami does not offer a fully on-line undergraduate program,[11] I assess the market value of the fully on-line education services (courses) it provided during the second half of Spring 2020, based on the observed pricing of on-line undergraduate programs on behalf of similarly situated schools. I determined the set of institutions that are comparable to U-Miami following a cluster analysis that I detail in Appendix 2.

   B. Methodology for Calculation of Tuition-related Damages

25. The proposed methodology to compute tuition-related damages relies on obtaining information at the student level. Thus, each student should be assigned a unique identifier. For each student, the following information corresponding to Spring 2020 semester is required:

   a. Indicator of whether the student withdrew from U-Miami prior to the campus closure announcement.

---

[9] Traditional students who take some on-line courses throughout their program, live nearby the school campus, or even in campus dormitories; they may access on-campus educations services, such as meeting in person with the Instructor and Teaching Assistant for an on-line course, tutoring services provided by the school, attend Speaker series, take tests in campus facilities, among others; also, they may use on-campus facilities like library services (e.g., study rooms and check out books), gyms, dorms, etc.

[10] Complaint ¶25.

[11] U-Miami offered the Bachelor of General Studies (BGS) during Spring 2020, through its Division of Continuing and International Education. (See capture of BGS's website dated February 15, 2020, in Internet Archive – WaybackMachine https://web.archive.org/web/20200215013108/http://bulletin.miami.edu/undergraduate-academic-programs/continuing-international-education/bachelor-general-studies/; last accessed on June 13, 2022) This undergraduate program offers students "[t]he option to enroll in a blend of daytime, evening, weekend, and on-line classes." (See BGS' brochure, available on-line at https://bgs.dcie.miami.edu/_assets/pdf/bgs-brochure.pdf; last accessed on June 13, 2022.)

b.  Indicator of whether the student was in a study abroad program.[12]

c.  Assessed total tuition (e.g., $25,200 in the case of full-time undergraduate).

d.  Total number of enrolled credit hours.

e.  Number of credit hours enrolled in (originally) scheduled on-line courses.

f.  List of all financial aid and corresponding amounts the student received from U-Miami (for example, Lead Plaintiff A. Dixon received $9,000 through the President's Scholarship).

26. Students who withdrew from U-Miami prior to the announcement that it was closing its campus facilities and moving to on-line classes only, are not considered members of the class. Thus, they will be either excluded from the calculation of damages or simply assigned $0 in damages.  Similarly, I was informed by counsel that students in study abroad programs are not part of the class that Plaintiffs will seek certification for.  Thus, to the extent that they are included in datasets I receive as part of the discovery process, I will need them to be properly identified so that I can exclude them from my analysis or simply assign them $0 in damages.

27. For expositional purposes, I refer to undergraduate students henceforth.  According to my understanding of the U-Miami's Fact Book 2019-2020, the tuition rate for undergraduate students enrolled in U-Miami was the same across programs.  In contrast, the tuition rate for graduate students varied across programs—e.g., Law and Medical degrees.  Thus, presenting the damages methodology is much simpler in terms of undergraduate rather than graduate students, but

---

[12] I understand from counsel that Plaintiffs are not moving for class-certification on behalf of this group of students.  Thus, to the extent that they are included in datasets I receive as part of the discovery process, I will need them to be properly identified so that I can exclude them from my analysis.

ultimately graduate students will have the same methodology applied, treating each graduate program as a subgroup with a tuition that applies to the entire subgroup.

28. The value of tuition-related education services for which an undergraduate student contracted with U-Miami ($Contracted\_Value_i$)[13] is given by the assessed total tuition (¶ 25 c), if the number of credit hours enrolled in (originally) scheduled on-line courses (¶ 25 e) is zero. Otherwise, the value of contracted services is computed by applying U-Miami's tuition pricing mechanism (discussed in Appendix 1) on the number of at-issue credit hours the student enrolled in ($HRS_i$), which results by subtracting the number of credit hours enrolled in (originally) scheduled on-line courses from the total number of enrolled credit hours (¶ 25 d).[14]

29. The value of U-Miami delivering all courses on-line in Spring 2020 semester to an undergraduate student ($On\text{-}line\_Value_i$), is computed based on the number of at-issue credit hours the student enrolled in ($HRS_i$) and the tuition rate for such credit hours delivered fully on-line ($Market\_On\text{-}line\_Tuition$).  This tuition rate, as mentioned above, is imputed based on the tuition rate that similarly situated schools charged in their fully on-line undergraduate programs at that time.[15]

30. An undergraduate student enrolled in U-Miami during Spring 2020 semester received a blend of the contracted tuition-related education services ($Contracted\_Value_i$) and the fully on-

---

[13] The sub-index "$i$" refers to a specific undergraduate student.

[14] See formula in ¶ 38 a.  Effectively, I am not seeking damages for those credit hours associated with courses that were scheduled to be delivered on-line.  However, this does not mean that the value of the education services provided through these on-line courses is the same as the on-line delivery of courses that took place during the second part of Spring 2020.  (See discussion in ¶¶22-24.)  Rather, in terms of provided education services, the deviation that occurred during the second part of Spring 2020 was greater in the case of courses scheduled for in-person delivery than on-line.  Since I do not have information to assess the latter deviation in terms of the first, I take the conservative approach of not seeking damages for scheduled on-line courses.

[15] See formula in ¶ 38 b.

line courses (*On-line_Value$_i$*).[16]  The student received the contracted tuition-related education services during fifty-two percent of the semester (*Received_Contracted_Value$_i$*).[17]  And the fully on-line courses during the remainder forty-eight percent of the semester (*Received_On-line_Value$_i$*).[18]  Adding what the student actually received from these two different tuition-related education services renders the student's total value received (*Received_Value$_i$*).[19]

31. Students experienced no change in the financial aid they received due to U-Miami closing its campus and delivering all courses on-line during the second part of Spring 2020 semester.[20]  Thus, an undergraduate student suffered damages if the value of tuition-related education services she contracted (and paid for) exceeds the tuition-related education services she actually received.

32. I have not seen evidence that U-Miami had influence over the financial aid undergraduate students received from a third-party, say, Pell grants, scholarships, student loans, etc.  Furthermore, these students cannot reallocate the financial aid they received for Spring 2020 since they already used it to pay for the education services they received from U-Miami at that time.

33. On the other hand, U-Miami did determine the financial aid it directly provided to undergraduate students in Spring 2020, for instance, the President's Scholarship.  Thus, for each student, I calculate the contracted value net of financial aid or "subsidies" provided by U-Miami

---

[16] See ¶17.

[17] See formula in ¶ 38 c.

[18] See formula in ¶ 38 d.

[19] See formula in ¶ 38 e. Note that the calculations of *Received_Value$_i$* presented in this report is conservative since I do not take into consideration the fact that Spring Break got extended one week.  During that week, students did not receive in-person or online education.  Thus, the *Received_Value$_i$* for that portion of the semester is actually $0.

[20] I understand from counsel that students receive assistance through CARES funds.  I further understand that this is considered federal aid.  Therefore, in my analysis I treat it the same as other third-party subsidies.

(*Net_Contracted_Value$_i$*) as well as the actual received value net of subsidies provided by U-Miami (*Net_Received_Value$_i$*).

34. Regardless of whether U-Miami could have modified the financial aid it directly assigned to students because it closed its campus to students and move all courses to on-line delivery mode, the fact is that the university did not.  Therefore, my calculation of the net values referred in the previous paragraph incorporates this fact.[21]

35. Thus, the damages suffered by an undergraduate student are calculated by subtracting the received value net of U-Miami's subsidies from the contracted value net of U-Miami's subsidies, if the result is positive; otherwise, the student incurred no tuition-related damages (*Tuition_Damages$_i$*).[22]

36. Once tuition-related damages have been computed for each undergraduate member in the putative class, summing up all these individual damages will produce the total tuition-related damages for undergraduate students in the putative class (*Tuition_Damages*).[23]

37. Pre-judgement interest charge on the tuition-related damages suffered by undergraduate students in the putative class (*Pre-judgement_Interest$_{Tuition\_Damages}$*) can be calculated in a straightforward manner, once both the interest rate and the period of time are determined.[24]

38. The methodology outlined here (to calculate tuition-related damages for undergraduate students in the putative class) can be summarized in the following set of formulas:[25]

    a.  *Contracted_Value$_i$* =

---

[21] See formulas in ¶¶ 38 f and 38 g.

[22] See formula in ¶ 38 h.

[23] See formula in ¶ 38 i.

[24] See formula in ¶ 38 j.

[25] This set of formulas apply to all undergraduate students who enrolled Spring 2020 semester but for (i) those who withdrew from the university prior the announcement that it was closing its campus and moving to deliver all course on-line, and (ii) those in a study abroad program.

- *Tuition_bill$_i$*, if the student did not enroll in any on-line course.

- Otherwise, calculate it based on at-issue credit hours ($HRS_i$ = total number of enrolled credit hours – number of credit hours enrolled in on-line courses) and the U-Miami's pricing mechanism, as follows:

$$HRS_i \times \$2,100 \qquad\qquad \text{if} \quad 1 \leq HRS_i \leq 11$$

$$\$25,200 \qquad\qquad\qquad \text{if} \quad 12 \leq HRS_i \leq 20$$

$$\$25,200 + [(HRS_i - 20) \times \$2,100] \qquad \text{if} \quad 20 < HRS_i$$

b. *On-line_Value$_i$ = HRS$_i$ × Market_On-line_Tuition*

c. *Received_Contracted_Value$_i$ = Contracted_Value$_i$ × .52*

d. *Received_On-line_Value$_i$ = On-line_Value$_i$ × .48*

e. *Received_Value$_i$ = Received_Contracted_Value$_i$ + Received_On-line_Value$_i$*

f. *Net_Contracted_Value$_i$ = Contracted_Value$_i$* – UMiami_Subsidy$_i$

g. *Net_Received_Value$_i$ = Received_Value$_i$* – UMiami_Subsidy$_i$

h. *Tuition_Damages$_i$* =

- *Net_Contracted_Value$_i$ – Net_Received_Value$_i$*, if positive

- $0, otherwise

i. *Tuition_Damages* = $\sum_{i \in I} Damages_i$

where *I* is the set of undergraduate students in the class

j. *Pre-judgement_Interest$_{Tuition\_Damages}$ = Tuition_Damages × [(1+R)$^T$-1]*

where  T is the number of periods; e.g., years

R is the interest rate per period; e.g., annual interest rate

C.  Methodology for Calculation of Student Fees-related Damages

39. Plaintiffs seek compensation for damages they suffered because they did not have access to services that they paid for through student fees, during the second part of Spring 2020 semester.

Counsel informed me that the At-issue student fees here are the following: Activity Fee, Athletic Fee, Wellness Center Fee, Student Health and Counseling Centers Fee, and Student Center Fee.[26]

40. The proposed methodology to compute student fees-related damages relies on obtaining information at the student level. Thus, each student should be assigned a unique identifier. For each student ($i$) and for each at-issue student fee ($k$), the following information corresponding to Spring 2020 semester is required:

    a. The payment amount that the student incurred for each at-issue student fee.

    b. The refund amount that the student received for each at-issue student fee.

    c. For each at-issue fee, the proportion of related services that U-Miami provided while its campus remained closed, and all courses were delivered on-line during Spring 2020.

41. The value of the services associated with each at-issue student fee, which a student contracted with U-Miami for the whole Spring 2020 semester, is given by the corresponding payment the student incurred (*Contracted_FValue$_{i,k}$*).[27] However, students received the contracted fee-related services for only a portion of the semester, specifically, for fifty-two percent of Spring 2020 semester. For each at-issue student fee, the methodology that I propose does credit the fee-related services that each student received as contracted (*Received_FValue_Open$_{i,k}$*).[28]

42. For the remaining forty-eight percent of the semester, U-Miami closed its campus to students, changed the delivery of all courses to fully on-line, and modified the provision of services related to student fees. Contingent on U-Miami providing, for each at-issue fee, the proportion of associated services that were available while the campus was closed, I could pro-rate the value that

---

[26] Complaint ¶ 37.
[27] See formula in ¶ 46 a.
[28] See formula in ¶ 46 c.

a student actually received from each fee-related service the student contracted with U-Miami ($Received\_FValue\_Closed_{i,k}$).[29]

43. For each contracted at-issue fee-related service, adding up the value received by a student during the portion of Spring 2020 when the campus was open and during the period when it was closed, renders the value actually received by the student from contracted services related to an at-issue fee ($Received\_FValue_{i,k}$).[30]

44. For each at-issue fee, the associated damages incurred by a student is the difference between the value contracted and the value actually received, net of corresponding refund received by the student ($FRefund_{i,k}$), if the result is positive; otherwise, the student suffered no fees-related damages ($FDamages_{i,k}$).[31]

45. Once damages associated to all at-issue fees have been computed for a given student, these damages can be summed up to obtain the total fees-related damages for that student ($Fees\_Damages_i$).[32]   In turn, these individual fees-related damages can be added up across all students in the class to get the total fees-related damages ($Fees\_Damages$).[33]   Pre-judgement interest charges can be estimated in a straightforward manner, as I discussed above for the case of tuition-related damages.[34]

46. The methodology outlined here (to calculate student fees-related damages for undergraduate students in the class) can be summarized in the following set of formulas:[35]

---

[29] See formula in ¶ 46 d.
[30] See formula in ¶ 46 e.
[31] See formula in ¶ 46 g.
[32] See formula in ¶ 46 h.
[33] See formula in ¶ 46 i.
[34] See formula in ¶ 46 j.
[35] The subindex $i$ refers to an undergraduate student, whereas the subindex $k$ refers to a specific at-issue student fee.

a. *Contracted_FValue$_{i,k}$* = student *i*'s payment for fee *k*

b. *Prop_FService$_k$* = proportion of services related to fee *k* that were available while campus was closed to students

c. *Received_FValue_Open$_{i,k}$* = .52 × *Contracted_Value_Fee$_{i,k}$*

d. *Received_FValue_Closed$_{i,k}$* = .48 × *Prop_Service_Fee$_k$*× *Contracted_Value_Fee$_{i,k}$*

e. *Received_FValue$_{i,k}$* = *Received_FValue_Open$_{i,k}$* + *Received_FValue_Closed$_{i,k}$*

f. *FRefund$_{i,k}$* = refund related to fee *k* received by student *i*

g. *FDamages$_{i,k}$* =

   – *Contracted_FValue$_{i,k}$* – *Received_FValue$_{i,k}$* – *FRefund$_{i,k}$*, if positive

   – *$0, otherwise*

h. *Fees_Damages$_i$* = $\sum_{k \in K} Damages_{i,k}$

   where *K* is the set of all at-issue fees

i. *Fees_Damages* = $\sum_{i \in I} Damages_i$

j. *Pre-judgement_Interest$_{Fees\_Damages}$ = Fees_Damages × [(1+R)$^T$-1]*

IV. Calculations of Damages for Lead Plaintiffs Ms. Dimitryuk and Ms. Dixon.

   A. Tuition-related Damages for Lead Plaintiff Valeria V. Dimitryuk.

47. Following the methodology that I presented in section III, here I describe the calculation of tuition-related damages for Ms. Dimitryuk, who was a traditional undergraduate student in U-Miami for the whole Spring 2020 semester.[36]  She was enrolled in 18 credit hours, none of them

---

[36] Thus, Ms. Dimitryuk did not withdraw from the university, nor was she enrolled in a study abroad program at that time.

in scheduled on-line courses, was billed $25,200.00 in tuition, and received no financial aid from U-Miami.[37]

48. On the other hand, the market tuition rate for the education services that U-Miami provided with all courses delivered on-line is $846.18[38] per course hour. Thus, had U-Miami delivered all courses on-line during the whole Spring 2020 semester, the value that Ms. Dimitryuk would have received is $15,231.26.[39]

49. Ms. Dimitryuk did receive the tuition-related education services she contracted with U-Miami during the first part of Spring 2020. In particular, she received $13,104.00 of the $25,200.00 in education services that she contracted (and paid for) with U-Miami.[40] During the remainder of the semester U-Miami provided fully on-line courses to Ms. Dimitryuk instead of the contracted education services. The assessed market value of these education services that is $7,311.00.[41] Therefore, Ms. Dimitryuk received $20,415.00 in tuition-related education services throughout Spring 2020 semester from U-Miami.[42]

50. Ms. Dimitryuk received no financial aid directly from U-Miami, thus, there is no difference between her contracted value ($25,200.00) and her contracted value net of subsidies provided by U-Miami ($25,200.00). The same holds for the value she actually received ($20,415.00) and that value net of U-Miami's subsidies ($20,415.00). Therefore, the assessed damages for Ms. Dimitryuk amount to $4,785.00.[43]

---

[37] So, the contracted value is $25,200 and the amount in subsidies from U-Miami is $0.
[38] See Appendix 2 for details.
[39] $15,231.26 = $846.18 \times 18$ (credit hours).
[40] $13,104.00 = .52 \times $25,200.00.
[41] $7,311.00 = .48 \times $15,231.26.
[42] $20,415.00 = $13,104.00 + $7,311.00.
[43] $4,785.00 = $25,200.00 - $20,415.00.

51. Plaintiffs' counsel also asked me to calculate pre-judgement interest at an annual interest rate of 6.66%. Broadly, it has been two years since the end of Spring 2020 semester.[44] Thus, for Ms. Dimitryuk's assessed damages, the current pre-judgement interest amounts to about $658.59.[45] Therefore, as of the date of this report, Ms. Dimitryuk has suffered approximately $5,443.58 in tuition-related damages including pre-judgement interest.[46] The calculation of tuition-related damages for Ms. Dimitryuk is summarized in Table 1.

**Table 1: Calculation of Tuition Damages for the Lead Plaintiff: Ms. Dimitryuk**

| Description | Dollar |
|---|---|
| $Contracted\_Value_i$ | $25,200.00 |
| $On\text{-}line\_Value_i$ | $15,231.26 |
| $Received\_Contracted\_Value_i$ | $13,104.00 |
| $Received\_On\text{-}line\_Value_i$ | $7,311.00 |
| $Received\_Value_i$ | $20,415.00 |
| $UMiami\_Subsidy_i$ | $0.00 |
| $Net\_Contracted\_Value_i$ | $25,200.00 |
| $Net\_Received\_Value_i$ | $20,415.00 |
| $Damages_i$ | $4,785.00 |
| $Pre\text{-}judgement\_Interest_i$ | $658.59 |
| $Damages\_Including\_Pre\text{-}Judgement\_Interest_i$ | $5,443.58 |

**B. Tuition-related Damages for Lead Plaintiff Adelaide E. Dixon.**

52. Following the methodology that I presented in section III, here I describe the calculation of tuition-related damages for the Ms. Dixon, who was a traditional undergraduate student in U-

---

[44] Ultimately, the Court will establish the time period over which pre-judgment interest is calculated.

[45] $658.59 = \$4,785.00 \times [(1 + .0666)^2 - 1]$

[46] In Appendix 2 I present the 95% confidence interval for the estimate of the market comparable on-line tuition rate ($846.18) that I use to estimate tuition-related damages. Therefore, the actual tuition-related damages suffered by Ms. Dimitryuk may vary from $2,639.93 to $6,930.06, with a 95% confidence level. Including pre-judgement interest charges, Ms. Dimitryuk's tuition-related damages may range from $3,003.28 to $7,883.89, with a 95% confidence level.

Miami for the whole Spring 2020 semester.[47]  She was enrolled in 15 credit hours, none of them in scheduled on-line courses, was billed $25,200.00 in tuition, and received $9,000 in financial aid from U-Miami.[48]

53. On the other hand, the hourly market tuition rate for the education services that U-Miami provided with all courses delivered on-line is $846.18.[49]  Thus, had U-Miami delivered all courses on-line during the whole Spring 2020 semester, the value that Ms. Dixon would had received is $12,692.72.[50]

54. Ms. Dixon did receive the tuition-related education services she contracted with U-Miami during the first part of Spring 2020.  In particular, she received $13,104.00 of the $25,200.00 in education services that she contracted (and paid for) with U-Miami.[51]  During the remainder of the semester U-Miami provided fully on-line courses to Ms. Dixon instead of the contracted education services.  The assessed market value of these education services that is $6,092.50.[52]  Therefore, Ms. Dixon received $19,196.50 in tuition-related education services throughout Spring 2020 semester from U-Miami.[53]

55. Ms. Dixon received $9,000 in financial aid directly from U-Miami.  Thus, her contracted value net of subsidies provided by U-Miami equals $16,200.00.[54]  Similarly, the value she actually

---

[47] Thus, Ms. Dimitryuk did not withdraw from the university, nor was she enrolled in a study abroad program at that time.

[48] So, the contracted value is $25,200 and the amount in subsidies from U-Miami is $9,000.

[49] See Appendix 2 for details.

[50] $12,692.72 = $846.18 × 15 (credit hours).

[51] $13,104.00 = .52 × $25,200.00.

[52] $6,092.50 = .48 × $12,692.72.

[53] $19,196.50 = $13,104.00 + $6,092.50.

[54] $16,200.00 = $25,200.00 − $9,000.00.

received in tuition-related education services net of U-Miami's subsidies amounts to $10,196.50.[55] Therefore, the assessed damages for Ms. Dixon add up to $6,003.50.[56]

56. Plaintiffs' counsel also asked me to calculate pre-judgement interest at an annual interest rate of 6.66%. It has been two years since the end of Spring 2020 semester.[57] Thus, for Ms. Dixon's assessed damages, the current pre-judgement interest amounts to about $826.29.[58] Therefore, as of the date of this report, Ms. Dixon has suffered approximately $6,829.79 in tuition-related damages including pre-judgement interest.[59] The calculation of tuition-related damages for Ms. Dixon is summarized in Table 2.

**Table 2: Calculation of Tuition Damages for the Lead Plaintiff: Ms. Dixon**

| Description | Dollar |
|---|---|
| $Contracted\_Value_i$ | $25,200.00 |
| $On\text{-}line\_Value_i$ | $12,692.72 |
| $Received\_Contracted\_Value_i$ | $13,104.00 |
| $Received\_On\text{-}line\_Value_i$ | $6,092.50 |
| $Received\_Value_i$ | $19,196.50 |
| UMiami_Subsidy$_i$ | $9,000.00 |
| $Net\_Contracted\_Value_i$ | $16,200.00 |
| $Net\_Received\_Value_i$ | $10,196.50 |
| $Damages_i$ | $6,003.50 |
| $Pre\text{-}judgement\_Interest_i$ | $826.29 |
| $Damages\_Including\_Pre\text{-}Judgement\_Interest_i$ | $6,829.79 |

---

[55] $10,196.50 = $19,196.50 − $9,000.

[56] $6,003.50 = $16,200.00 − $10,196.50.

[57] Ultimately, the Court will establish the time period over which pre-judgment interest is calculated.

[58] $826.29 = $6,003.50 × $[(1 + .0666)^2 − 1]$

[59] In Appendix 2 I present the 95% confidence interval for the estimate of the market comparable on-line tuition rate ($846.18) that I use to estimate tuition-related damages. Therefore, the actual tuition-related damages suffered by Ms. Dixon may vary from $4,215.94 to $7,791.05, with a 95% confidence level. Including pre-judgement interest charges, Ms. Dixon's tuition-related damages may range from $4,796.20 to $8,863.38, with a 95% confidence level.

C.  Student Fees-related Damages for Lead Plaintiff Valeria V. Dimitryuk.

57. In section III.C, I outlined the proposed methodology to compute the student fees-related damages for class members, as well as the information required to perform such calculation.  While I do not have all the necessary information, the calculations presented in this section (and in section III.D) serve to show how my proposed student fees-related damages can be implemented once the Defendant produces in discovery all the information that is needed.

58. I received a file[60] that seems to summarize all financial activities between U-Miami and Lead Plaintiff Ms. Dimitryuk, including charges and refunds that took place in Spring 2020.  In this document, I identified the student fees that Ms. Dimitryuk incurred in Spring 2020, including the corresponding charge and refund amounts.  This information is included the table 3 below.

**Table 3.- Student Fees-Related Transactions for Ms. V. Dimitryuk.**

| Fee | Concept | Charge |
|---|---|---|
| Athletic Fee | Charge | 90.00 |
| | Refund | 19.99 |
| Wellness Center Fee | Charge | 156.00 |
| | Refund | 0.00 |
| Student Center Fee | Charge | 166.00 |
| | Refund | 60.59 |
| Activity Fee | Charge | 167.00 |
| | Refund | 60.96 |
| Health & Counsel Centers Fee | Charge | 186.00 |
| | Refund | 0.00 |

---

[60] "Dimitruyk Activity.pdf," Ms. Dimitryuk's Account Activity Total, dated 02/18//2022 2:32:43 PM.

59. Following ¶ 40, I still do not have all the information for the calculation of student fees-related damages for Ms. Dimitryuk.  In particular, I do not have the proportion of at-issue fees-related services that U-Miami provided while its campus remained closed, and all courses were delivered on-line during Spring 2020.  Nonetheless, assuming this proportion is zero across all student fees, I would be able to show how the proposed method can produce an estimate of student fees-related damages for a student.

60. To the extent that the referred proportion ($Prop\_FService_k$) is larger than zero, the resulting damages estimates would be the largest damages figures.  These damages estimates are displayed in Table 4, for each at-issue student fee associated to Ms. Dimitryuk as well as the total student fees-related damages for her.

**Table 4.- Student Fees-Related Damages for Ms. V. Dimitryuk.**

| Concept | Athletic Fee | Wellness Center Fee | Student Center Fee | Activity Fee | Health & Counsel Centers Fee | Total Student-Fees Related Damages |
|---|---|---|---|---|---|---|
| $Contracted\_FValue_{i,k}$ | 90.0 | 156.0 | 166.0 | 167.0 | 186.0 | |
| $Prop\_FService_k$ | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | |
| $Received\_FValue\_Open_{i,k}$ | 46.8 | 81.1 | 86.3 | 86.8 | 96.7 | |
| $Received\_FValue\_Closed_{i,k}$ | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | |
| $Received\_FValue_{i,k}$ | 46.8 | 81.1 | 86.3 | 86.8 | 96.7 | |
| $FRefund_{i,k}$ | 20.0 | 0.0 | 60.6 | 61.0 | 0.0 | |
| $FDamesi,k$ | 23.2 | 74.9 | 19.1 | 19.2 | 89.3 | 225.7 |

D.  Student Fees-related Damages for Lead Plaintiff Adelaide E. Dixon.

61.   This section has the same purposes as section III.C, but for the case of Lead Plaintiff Ms. Dixon.  I received a file[61] that seems to summarize all financial activities between U-Miami and Ms. Dixon, including charges and refunds that took place in Spring 2020.  In this document, I identified the student fees that Ms. Dixon incurred in Spring 20202, including the corresponding charge and refund amounts.  This information is included the table 5 below.

**Table 5.- Student Fees-Related Transactions for Ms. V. Dixon.**

| Fee | Concept | Charge |
|---|---|---|
| Athletic Fee | Charge | 90.00 |
| | Refund | 25.34 |
| Wellness Center Fee | Charge | 156.00 |
| | Refund | 56.94 |
| Student Center Fee | Charge | 166.00 |
| | Refund | 60.59 |
| Activity Fee | Charge | 167.00 |
| | Refund | 60.96 |
| Health & Counsel Centers Fee | Charge | 186.00 |
| | Refund | 67.89 |

62. Following ¶ 40, I still do not have all the information for the calculation of student fees-related damages for Ms. Dixon.  In particular, I do not have the proportion of at-issue fees-related services that U-Miami provided while its campus remained closed, and all courses were delivered on-line during Spring 2020.  Nonetheless, assuming this proportion is zero across all student fees,

---

[61] "Dixon Activity.pdf," Ms. Dixon's Account Activity Total, dated 02/18//2022 2:33:41 PM.

I would be able to show how the proposed method can produce an estimate of student fees-related damages for a student.

63. To the extent that the referred proportion ($Prop\_FService_k$) is larger than zero, the resulting damages estimates would be the largest damages figures.  These damages estimates are displayed in Table 6, for each at-issue student fee associated to Ms. Dixon as well as the total student fees-related damages for her.

**Table 6.- Student Fees-Related Damages for Ms. V. Dixon.**

| Concept | Athletic Fee | Wellness Center Fee | Student Center Fee | Activity Fee | Health & Counsel Centers Fee | |
|---|---|---|---|---|---|---|
| $Contracted\_FValue_{i,k}$ | 90.0 | 156.0 | 166.0 | 167.0 | 186.0 | **Total Student-Fees Related Damages** |
| $Prop\_FService_k$ | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | |
| $Received\_FValue\_Open_{i,k}$ | 46.8 | 81.1 | 86.3 | 86.8 | 96.7 | |
| $Received\_FValue\_Closed_{i,k}$ | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | |
| $Received\_FValue_{i,k}$ | 46.8 | 81.1 | 86.3 | 86.8 | 96.7 | |
| $FRefund_{i,k}$ | 25.3 | 56.9 | 60.6 | 61.0 | 67.9 | |
| $FDamagesi,k$ | 17.9 | 17.9 | 19.1 | 19.2 | 21.4 | 95.5 |

V.  Provisional Calculation of Tuition-related Damages for Undergraduate Students in the Putative Class.

64. At this point Defendant has not produced the student level information for all students that is needed to calculate tuition-related damages for all members in the putative class, following the proposed damages calculation method that I discussed in section III.  So, in this section I provide a rough and provisional estimate of tuition-related damages for undergraduate students in the putative class, based on publicly available sources, Plaintiffs' pleadings, and assumptions as

needed.  The available information is not enough to provide a similar estimate for graduate students in the putative class.

65. The publicly available sources I used include U-Miami's website and information for U-Miami available from the National Center for Education Statistics ("NCES") Postsecondary Education Data System ("IPEDS") Survey.  I obtained the tuition prices from U-Miami's Fact Book 2019-2020, which I downloaded from the Institutional Research and Strategic Analytics' website as of January 2020.[62]  When needed, I rely on sensible assumptions to make-up for the lack of information.[63]

66. As I explain next, the calculation of damages that I present here follows damages method that I discussed in section III.B.  Thus, the first step is to estimate the aggregate value of all tuition-related education services that enrolled undergraduate students contracted with U-Miami for Spring 2020.  Alternatively, add up the tuition bills across all undergraduate students.

67. IPEDS provides the counts of full-time (*Full-time_UG_St*) and part-time (*Part-time_UG_St*) undergraduate students enrolled in U-Miami during Fall 2019.[64]  Based on these counts, and assuming that full-time students on average took 15 credit hours in Spring, I calculate the total tuition bill for these students following U-Miami's tuition pricing mechanism.  I follow the same procedure to compute the total tuition bill for part-time undergraduate students but for the assumption about the average enrolled credit hours; I consider three scenarios, where these

---

[62] https://irsa.miami.edu/_assets/pdf/fbfa2019.pdf
[63] More details are included in the backup materials (See file "Aggregate Tuition Damages, UG students.xlsx").
[64] 10,701 full-time students and 606 part-time students.

students enrolled in 3, 6, or 9 credit hours.  Therefore, I estimate the total tuition billed to all undergraduate students (*Contracted_AValue$_S$*) for each of these three scenarios. [65, 66]

68. Similarly, the aggregate value of U-Miami delivering all courses on-line in Spring 2020 semester to undergraduate students (*On-line_Value$_S$*) is obtained for each of the three referred scenarios. [67]  It is computed based on the total number of credit hours the student enrolled in and the tuition rate for such credit hours delivered fully on-line.  Following the discussion in the previous paragraph, to estimate the total number of enrolled credit hours I assume that each full-time undergraduate student was enrolled in 15 credit hours and consider the referred three scenarios for part-time students.[68]  The on-line tuition rate (*Market_On-line_Tuition*), as mentioned before, is imputed based on the hourly tuition rate that similarly situated schools charged in their fully on-line undergraduate programs at that time; i.e., $825.14.

69. As discussed in section III.B, undergraduate students enrolled in U-Miami during Spring 2020 semester received a blend of the contracted tuition-related education services (*Contracted_AValue$_S$*) and the fully on-line courses (*On-line_AValue$_S$*).  Students received the contracted tuition-related education services during fifty-two percent of the semester (*Received_Contracted_AValue$_S$*).[69]  And the fully on-line courses during the remainder forty-eight percent of the semester (*Received_On-line_AValue$_S$*).[70]  Adding what the student actually received

---

[65] See formula in ¶ 72 a.  The tuition bill for each full-time student (assumed to be enrolled in 15 credit hours) is $25,200, according with U-Miami's tuition pricing mechanism.  Similarly, each part-time student pays $2,100 per enrolled credit hour and, by assumption, all of them were enrolled in the same number hours either 3, 6 or 9, depending on the scenario.

[66] The subindex "*S*" refers to these three scenarios, which are considered throughout the damages calculation in this section.

[67] See formula in ¶ 72 b.

[68] Notice that this calculation assumes that none of the computed credit hours were associated to scheduled on-line courses, since I do not have information to determine the count of the latter.

[69] See formula in ¶ 72 c.

[70] See formula in ¶ 72 d.

from these two different tuition-related education services renders the student's total value received (*Received_AValue$*).[71]   (Again, all values mentioned in this paragraph vary across the considered scenarios.)

70. IPEDS does not provide the total amount of financial aid that U-Miami directly provided to undergraduate students.   Instead, IPEDS provides both the total grant and scholarship aid and the Pell Grants only amount that U-Miami's undergraduate students received during the academic year 2019-2020.[72]   I subtract the latter from the first to get a rough estimate of private aid received by these students.   Then, impute the resulting amount as the amount of financial aid provided directly by U-Miami during the said academic year.   This last result is divided by two, to get an estimate that corresponds to one semester.   This estimate clearly exceeds the amount of financial aid that U-Miami provided to its undergraduate students during Spring 2020 (*UMiami_ASubsidy*); also, it remains the same across the considered three scenarios.   Whether I use the exact number or an approximation, however, does not alter the damages estimate since subsidies remained the same in the two-periods (before and after closure).

71. Following the damages calculation method outlined in section III.B, I calculate the contracted value net of financial aid or "subsidies" provided by U-Miami (*Net_Contracted_AValue$*)[73] as well as the actual received value net of subsidies provided by U-Miami (*Net_Received_AValue$*),[74] for each of the three scenarios.   Therefore, the resulting

---

[71] See formula in ¶ 72 e.
[72] $259,725,400 in Grant & Scholarship Aid provided to all undergraduate students; $8,081,880 in Pell Grants (only) to all undergraduate students.
[73] See formula in ¶ 72 f.
[74] See formula in ¶ 72 g.

aggregate tuition-related damages (*Tuition_ADamages$_S$*)[75] is difference between these two values. Finally, the calculation of related pre-judgement interest is performed in the same way as before.[76]

72. The methodology outlined here (to calculate tuition-related damages for all undergraduate students in the class) can be summarized in the following set of formulas:[77]

a.  *Contracted_AValue$_S$* =

  −  Scenario 1

    *(Full-time_UG_St × $25,200) + (Part-time_UG_St × 3 × $2,100)*

  −  Scenario 2

    *(Full-time_UG_St × $25,200) + (Part-time_UG_St × 6 × $2,100)*

  −  Scenario 3

    *Full-time_UG_St × $25,200) + (Part-time_UG_St × 9 × $2,100)*

b.  *On-line_AValue$_S$* =

  −  Scenario 1

    *[ (Full-time_UG_St × 15) + (Part-time_UG_St × 3) ] × Market_On-line_Tuition*

  −  Scenario 2

    *[ (Full-time_UG_St × 15) + (Part-time_UG_St × 6) ] × Market_On-line_Tuition*

  −  Scenario 3

    *[ (Full-time_UG_St × 15) + (Part-time_UG_St × 9) ] × Market_On-line_Tuition*

c.  *Received_Contracted_AValue$_S$ = Contracted_AValue$_S$ × .52*

    for each *S* = {Scenario 1, Scenario 2, Scenario 3}

d.  *Received_On-line_AValue$_S$ = Received_On-line _AValue$_S$ × .48*

    for each *S* = {Scenario 1, Scenario 2, Scenario 3}

---

[75] See formula in ¶ 72 h.

[76] See formula in ¶ 72 i.

[77] This set of formulas apply to aggregate values and counts that cover all undergraduate students who enrolled Spring 2020 semester; thus, these values may include (i) those who withdrew from the university prior the announcement that it was closing its campus and moving to deliver all course on-line, and (ii) those in a study abroad program.

e. $Received\_AValue_S = Received\_Contracted\_AValue_S + Received\_On\text{-}line\_AValue_S$

    for each $S = \{$Scenario 1, Scenario 2, Scenario 3$\}$

f. $Net\_Contracted\_AValue_S = Contracted\_AValue_S - UMiami\_ASubsidy$

    for each $S = \{$Scenario 1, Scenario 2, Scenario 3$\}$

g. $Net\_Received\_AValue_S = Received\_AValue_S - UMiami\_Subsidy$

    for each $S = \{$Scenario 1, Scenario 2, Scenario 3$\}$

h. $Tuition\_ADamages_S =$

    – $Net\_Contracted\_AValue_S - Net\_Received\_Value_S$, if positive

    – $\$0$, otherwise

    for each $S = \{$Scenario 1, Scenario 2, Scenario 3$\}$

i. $Pre\text{-}judgement\_Interest_S = Tuition\_ADamages_S \times [(1+R)^T - 1]$

    for each $S = \{$Scenario 1, Scenario 2, Scenario 3$\}$

    where  T is the number of periods; e.g., years

                 R is the interest rate per period; e.g., annual interest rate

73. Using the aggregate information that is available to me at this time and the proposed damages calculation method, I come up with a provisional and rough estimate of class-wide tuition damages for undergraduate that is between $65,337,551 and $67,525,816, depending on the assumed scenario regarding the average number of credit hours part-time students were enrolled in.  Similarly, when I consider pre-judgement interest the class-wide Tuition damages for undergraduate students is between $74,330,321  and $76,819,770.[78]  Details are provided in Table 7.[79]

---

[78] For calculating pre-judgement interest, as mentioned before, I assume compounding interest of 6.66% for two years.

[79] In Appendix 2 I present the 95% confidence interval for the estimate of the market comparable on-line tuition rate ($846.18) that I use to estimate tuition-related damages.  Using the value at both ends of this confidence interval, the provisional and rough estimate of tuition-related

**Table 7.- Rough and Provisional Tuition-Related Damages for Undergraduate Students in the Putative Class.**

| Description | Scenario 1 ($) | Scenario 2 ($) | Scenario 3 ($) |
|---|---|---|---|
| *Contracted _AValue* | 273,483,000 | 277,300,800 | 281,118,600 |
| *UMiami_ASubsidy* | 125,821,760 | 125,821,760 | 125,821,760 |
| *On-line_AValue* | 137,363,102 | 138,901,459 | 140,439,816 |
| *Received_Contracted_AValue* | 142,211,160 | 144,196,416 | 146,181,672 |
| *Received_On-line_AValue* | 65,934,289 | 66,672,700 | 67,411,112 |
| *Received_AValue* | 208,145,449 | 210,869,116 | 213,592,784 |
| *Net_Contracted_AValue* | 147,661,240 | 151,479,040 | 155,296,840 |
| *Net_Received_AValue* | 82,323,689 | 85,047,356 | 87,771,024 |
| *Tuition_ADamages* | 65,337,551 | 66,431,684 | 67,525,816 |
| *Pre-judgement interest* | 8,992,770 | 9,143,362 | 9,293,954 |
| *Tuition_ADamages + Pre-judgment Interest* | 74,330,321 | 75,575,046 | 76,819,770 |

VI. Conclusions

74. As I discussed in this report, there is a viable methodology for computation of damages. Provided needed data is available, this method will render estimates at the student level of both tuition-related and student fees-related damages, which can then be aggregated across members of the putative class.

---

damages for undergraduate students in the putative class varies from $45,992,266 to $84,682,842, in scenario 1; $46,869,747 to $85,993,626, in scenario 2; $47,747,228 to $87,304,411, in scenario 3. Including pre-judgement interest, this provisional estimate of damages varies from $52,322,437 to $96,338,212, in scenario 1; $53,320,691 to $97,829,407, in scenario 2; $54,318,944 to $99,320,602, in scenario 3.

75. This methodology, as discussed in section V, can provide provisional estimates of total damages for members in the putative class off aggregate information.   Because of lack completeness in the aggregate information that the damages model requires, I presented here rough and preliminary estimates of tuition-related damages for undergraduate students in the putative class.

76. The range of provisional and rough estimates of total tuition-related damages for undergraduate students, before applying prejudgment interest, is $65,337,551 and $67,525,816. When I apply pre-judgement my estimate of damages is between $74,330,321 and $76,819,770.

July 15, 2022
San Antonio, TX

_____
Charles D. Cowan, Ph.D.

# CHARLES D. COWAN, Ph.D.

ANALYTIC FOCUS LLC



## KEY QUALIFICATIONS

Charles D. Cowan is Managing Partner of ANALYTIC FOCUS LLC.  Dr. Cowan has 40 years of experience in statistical research and design.  He consults for numerous public and private sector entities on the design, implementation, and evaluation of research and the synthesis of statistical and sampling techniques for measurement.

Dr. Cowan has designed some of the largest and most complex research programs conducted by the Federal Government, including the Post Enumeration Program conducted by the Bureau of the Census to evaluate the 1980 Decennial Census, the Economic Cash Recovery valuations conducted by the Resolution Trust Corporation in 1990-95, and many evaluation studies conducted for the Justice Department, the Department of Defense, the Department of Housing and Urban Development, and the Treasury Department.  He has provided expert advice to corporations and government agencies on the incorporation of complex research designs in demographic and economic measurement problems, including:

- Development of procedures used by the Resolution Trust Corporation and the FDIC for determination of the value of all assets held by the RTC\FDIC taken from failed banks and S&Ls.   Results from this research were used in quarterly reports to Congress on the loss to the American taxpayer that resulted from these failures.  These estimates of anticipated recoveries on assets were also used by the RTC and FDIC for financial reporting.

- Establishment of audit and sampling methods to determine the completeness and reliability of reporting and record systems.  These procedures were used to both expand and streamline bank examinations for safety and soundness and also compliance measurement for the FDIC.   These sampling techniques are applied in the audit of Federal agencies concerned with regulatory review of operations and systems, and related systems for banks, regulatory agencies, and law firms;

- Application of econometric and biometric procedures for measurement of credit risk in large portfolios of loans.  These models are frequently used for a variety of purposes within financial institutions, such as the pricing of loans, the management of customers long term, decision making on workouts for delinquent loans, and for establishment of economic and regulatory reserves.

**CHARLES D. COWAN**

(Page 2)

- Evaluation of research conducted for the Department of Defense, for the National Institutes of Health, and for the Department of Agriculture, each in response to Congressional inquiries on the validity of published results, and also for defendants in lawsuits involving evidence proffered by plaintiffs in furtherance of their suit.

- Model fitting and development of projection methods to measure the likelihood of loss or errors in recording in loans held by banks or put up for auction; measurement of the likelihood of fraud and/or noncompliance in systems, including bank holding companies, trading activities for brokers, and systems for compliance with health department and judicial requirements;

- Development of procedures used by the Bureau of the Census for apportionment of population for revenue sharing purposes and the estimation of the undercount in the Decennial Census of Population and Housing.  These procedures include application of capture-recapture methods to measure the size of the undercount in the decennial census, use of network sampling as an alternative measure for population size, and measurement of the reliability of data collected in the Census.

- Development of statistical methods to quantify the size of populations, including nomadic populations for the Census of Somalia, the undercount and overcount in the Census of Egypt, the number of missing children in Chicago, IL, and the number of homeless persons and families needing services in several large cities with transient populations.

Dr. Cowan teaches graduate and undergraduate courses in survey methods, statistics, and computer methods for analysis.  He is the co-author of two books, one on evaluation of survey and census methods and one on econometric measures related to the welfare of the U.S. economy.  He has written numerous articles on statistical methods, sampling, rare and elusive population research, and optimization techniques.

Prior to cofounding ANALYTIC FOCUS LLC, Dr. Cowan was a Director with ARPC and with Price Waterhouse, where he specialized in financial research and audit sampling.  From 1991 to 1996, Dr. Cowan was the Chief Statistician for the Resolution Trust Corporation and the Federal Deposit Insurance Corporation, where he designed research necessary to measure the loss from the Savings & Loan Crisis of the late 1980's.  Dr. Cowan also served as the Chief Statistician for the U.S. Department of Education, where he designed large-scale surveys of educational institutions to measure resource needs and availability, and for Opinion Research Corporation, where he designed predictive models of demand for automobile manufacturers, banks, and large horizontally diverse firms like GE and AT&T.  Dr. Cowan worked for the U.S. Bureau of the Census, where he was the Chief of the Survey Design Branch and developed many of the techniques in use today for the evaluation of coverage in surveys and censuses.

**CHARLES D. COWAN**

(Page 3)

---

## EDUCATION

Ph.D., Mathematical Statistics, The George Washington University, 1984
M.A., Economics, The University of Michigan, 1973
B.A., English and B.A., Economics, The University of Michigan, 1972

## PROFESSIONAL EXPERIENCE

Co-Founder, ANALYTIC FOCUS LLC, January, 2002 to present.

Director, ARPC, November, 1999 to December, 2001.

Director, PricewaterhouseCoopers LLP, January 1997 to November, 1999.

Chief Statistician, Federal Deposit Insurance Corporation / RTC, 1991 to 1996.

Chief Statistician, Opinion Research Corporation, 1989 to 1991.

Chief Statistician, National Center for Education Statistics, US Dept. of Education, 1986 to 1989.

Bureau of the Census: Assistant Division Chief, International Statistical Programs Center, 1984 to 1986; Staff Liaison for Statistical Litigation Support, 1983 to 1984; Chief, Survey Design Branch, Statistical Methods Division, 1978 to 1983; Acting Chief, Survey Analysis and Evaluation Branch, Demographic Surveys Division, 1976 to 1978; Office of the Chief, Statistical Research Division, 1975 to 1976

Survey Research Center, Oregon State University: Manager, 1974 to 1975

Institute for Social Research, U. of Michigan: Assistant Study Director, 1972 to 1974.

## PROFESSIONAL ASSOCIATIONS

Professor, Statistics, University of Alabama – Birmingham
Associate Professor, Statistics, George Washington University
Visiting Research Professor, Survey Research Laboratory, U. of Illinois

## PROFESSIONAL SOCIETIES – MEMBERSHIPS

American Statistical Association (ASA)

## PROFESSIONAL SOCIETIES - POSITIONS

President, Research Industry Coalition, 1999-2000
Council Member, Research Industry Coalition, Representative from ASA, 1995-2000
President, Washington/Baltimore Chapter of AAPOR, 1998
Program Chair, American Association for Public Opinion Research, 1991-1992
Program Chair, Section on Survey Research Methods, ASA, 1989-90
Secretary-Treasurer, AAPOR, 1985-1986
Associate Secretary-Treasurer, AAPOR, 1984-1985
Editorial Board, Public Opinion Quarterly, 1980-1984
Editorial Board, Marketing Research, 1989-2000
Chair, Conference Committee, AAPOR, 1982-1989
Chair, Committee on Privacy and Confidentiality, ASA, 1980-1981

---

**CHARLES D. COWAN**

(Page 4)

---

## PUBLICATIONS

Strumpel, Burkhard; Cowan, Charles; Juster, F. Thomas; and Schmiedeskamp, Jay; editors, Surveys of Consumers 1972-73, Contributions to Behavioral Economics, Ann Arbor:  The Institute for Social Research, 1975.

Duncan, Greg, and Cowan, Charles D., "Labor Market Discrimination and Nonpecuniary Work Rewards" in Surveys of Consumers 1972-73, Contributions to Behavioral Economics, Ann Arbor:  The Institute for Social Research, 1975.

Curtin, Richard T. and Cowan, Charles D. "Public Attitudes Toward Fiscal Progress" in Surveys of Consumers 1972-73, Contributions to Behavioral Economics, Ann Arbor:  The Institute for Social Research, 1975.

Goldfield, Edwin D.; Turner, Anthony G.; Cowan, Charles D.; Scott, John C., "Privacy and Confidentiality as Factors in Survey Response" in Public Data Use, Vol. 6, No 4, July 1978.

Cowan, Charles D., and Spoeri, Randall K., "Statistical Distance Measures and Test Site Selection: Some Considerations", Proceedings of the Computer Science and Statistics:  Eleventh Annual Symposium on the Interface, 1978.

Bushery, John R., Cowan, Charles D., and Murphy, Linda R., "Experiments in Telephone-Personal Visit Surveys", Proceedings of the Amer. Stat. Assoc., Sect. on Survey Research Methods, 1978.

Spoeri, Randall K., and Cowan, Charles D., "On the Use of Distance Measures in Test Site Selection: A Practical Application Using Census Data", Proceedings of the American Statistical Association, Section on Business and Economic Statistics, 1978.

Cowan, Charles D.; Murphy, Linda R.; Wiener, Judy, US Bureau of the Census, "Effects of Supplemental Questions on Victimization Estimates from the National Crime Survey" in Proceedings of the American Statistical Association, Sect. on Survey Research Methods, 1978.

Bateman, David V.; Cowan, Charles D., US Bureau of the Census, "Plans for the 1980 Census Coverage Evaluation" in Proceedings of the American Statistical Association, Section on Survey Research Methods, 1979.

Hogan, Howard, and Cowan, Charles D., "Imputations, Response Errors, and Matching in Dual System Estimation", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1980.

Schwartz, Sidney H., Cowan, Charles D., and Sausman, Kenneth R., "Optimization in the Design of a Large-Scale State Sample", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1980.

---

**CHARLES D. COWAN**

(Page 5)

---

Cowan, Charles D., "Modifications to Capture-Recapture Estimation in the Presence of Errors in the Data" presented at the meetings of the American Statistical Association, Biometrics Section, 1982 (no proceedings).

Fay, Robert; Cowan, Charles, US Bureau of the Census, "Missing Data Problems in Coverage Evaluation Studies" in Proceedings of the American Statistical Association, Section on Survey Research Methods, 1983.

Cowan, Charles D.; Fay, Robert E., "Estimates of Undercount in the 1980 Census" in Proceedings of the American Statistical Association, Section on Survey Research Methods, 1984.

Cowan, Charles D. "Interviews and Interviewing", The Social Science Encyclopedia, Routledge and Kegan Paul, Publishers, The Netherlands, 1984.

Wei, L. J. and Cowan, Charles D. "Selection Bias", Encyclopedia of Statistical Science, John Wiley and Sons, New York, N.Y., 1984.

Cowan, Charles D. and Malec, Donald J. "Capture-Recapture Models When Both Sources Have Clustered Observations", Journal of the American Statistical Association, June 1986, Vol. 81, # 394, pp. 347-353, and Proceedings of the American Statistical Association, Section on Survey Research Methods, 1984.

Cowan, Charles D., The Effects of Misclassification on Estimates from Capture-Recapture Studies. Unpublished doctoral dissertation, The George Washington University, September 1984.

Sudman, Seymour; Cowan, Charles D., "Questionnaire Design Activities in Government Statistics Offices" in Special Issue on Questionnaire Design, Jour. of Official Statistics, Vol. 1, No. 2, 1985.

Cowan, Charles D. "Misclassification of Categorical Data", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1985.

Cowan, Charles D., Biemer, Paul P., Magnani, Robert J., and Turner, Anthony G., Evaluating Censuses of Population and Housing, Statistical Training Document, ISP-TR-5, U.S. Department of Commerce, Bureau of the Census, 1985.

Cowan, Charles D., Turner, Anthony G., and Stanecki, Karen "Design of the Somali Post Enumeration Survey (1986-1987)", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1986.

Cowan, Charles D., Breakey, William R., and Fischer, Pamela J. "The Methodology of Counting the Homeless", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1986.

---

**CHARLES D. COWAN**

(Page 6)

Cowan, Charles D. and Malec, Donald J. "Sample Allocation for a Multistage, Multilevel, Multivariate Survey", Proceedings of the Fourth Annual Research Conference (ARC IV), U.S. Bureau of the Census, 1988.

Frey, Carolin M., McMillen, Marilyn M., Cowan, Charles D., Horm, John W., and Kessler, Larry G.. "Representativeness of the Surveillance, Epidemiology, and End Results Program Data: Recent Trends in Mortality Rates", Journal of the National Cancer Institute, Vol. 84, # 11, June 3, 1992.

Cowan, Charles D., Breakey, William R., and Fischer, Pamela J. "The Methodology of Counting the Homeless, A Review" in Homelessness, Health, and Human Needs. Institute of Medicine, National Academy Press, National Academy of Sciences, Washington, D.C., 1988.

Cowan, Charles D., "Standards for Statistical Surveys in the Federal Government: Practices in the Center for Education Statistics", Proceedings of the American Statistical Association, Section on Survey Methods Research, 1988.

Sudman, Seymour, Sirken, Monroe G., and Cowan, Charles D., "Sampling Rare and Elusive Populations", Science, Vol. 240, pp. 991-996, May 20, 1988.

Cowan, Charles D., "Mall Intercepts and Clinical Trials: The Philosophy of Inference from Different Types of Research Designs" in Marketing Research: A Magazine of Management & Applications, Vol. 1, No. 1, March 1989.

Cowan, Charles D., "Mall Intercepts: Principles of Design for Research" in Proceedings of the Seventh Annual Advertising Research Foundation Research Quality Workshop, Sept. 1989.

Cowan, Charles D., "Estimating Census and Survey Undercounts Through Multiple Service Contacts" in Housing Policy Debate: Counting the Homeless: The Methodologies, Policies, and Social Significance Behind the Numbers, Volume 2, Issue 3, pp. 869-882, 1991.

Cowan, Charles D., "Ratio vs. Regression Estimators in a Large Scale Survey of S&L's" in Proceedings of the Section on Survey Research Methods, American Statistical Assoc., 1992.

Cowan, Charles D., "A Longitudinal Survey and Reality Check for the Value of Financial Assets" in Proceedings of Statistics Canada Symposium 92: Design and Analysis of Longitudinal Surveys, November 1992.

Cowan, Charles D., and Wittes, Janet, "Intercept Studies, Clinical Trials, and Cluster Experiments: To Whom Can We Extrapolate?" in Controlled Clinical Trials, Vol.15, pp.24-29, 1994.

**CHARLES D. COWAN**

(Page 7)

---

Cowan, Charles D.; Klena, Mathew J., Resolution Trust Corp, "Allocation of Proceeds from Bulk Auctions to Individual Assets" in <u>Proceedings of the American Statistical Association, Section on Business and Economic Statistics</u>, 1995.

Cowan, Charles D. "Statistical Sampling as a Management Tool in Banking" in <u>FDIC Banking Review</u>, 1997, Vol. 10, No. 1.

Cowan, Charles D., "Coverage, Sample Design, and Weighting in Three Federal Surveys" in <u>Journal of Drug Issues</u>, October 2001.

Cowan, Charles D., "Use of Mass Appraisals in Toxic Tort Litigation Involving Loss of Value" in <u>Proceedings of the International Association of Assessment Officers</u>, October 2002.

Cowan, Adrian M. and Cowan, Charles D., "Default Correlation:  An Empirical Investigation of a Subprime Lender", <u>The Journal of Banking and Finance</u>, March 2004.

Cowan, Charles D. and Cowan, Adrian M., "A Survey Based Assessment of Financial Institution Use of Credit Scoring for Small Business Lending", <u>SBA Report 283</u>, Nov. 2006

Keith, Scott W., Wang, Chenxi, Fontaine, Kevin R., Cowan, Charles D. and Allison, David B.  "Body Mass Index and Headache Among Women: Results From 11 Epidemiologic Datasets", <u>Obesity</u>, Volume 16, Issue 2 (February 2008) 16: 377-383; doi:10.1038/oby.2007.32

Cowan, Adrian M. and Cowan, Charles D., "The Dynamics of Credit Quality and Implications for the Pricing of Small Business Loans", <u>The International Journal of Banking and Finance</u>, 2007/08 (March) Vol. 5. Number 2:2008: 31-60

Brock, David W., Thomas, Olivia, Cowan, Charles D., Hunter, Gary R., Gaesser, Glenn A., and Allison, David B., "Association between Physical Inactivity and Prevalence of Obesity in the United States", <u>Journal of Physical Activity and Health</u>, January, 2009

Cowan, Adrian M. and Cowan, Charles D., Disparate Impact Analyses: Relevant Numbers, Relevant Populations (August 3, 2009). Available at SSRN: https://ssrn.com/abstract=1443560 or http://dx.doi.org/10.2139/ssrn.1443560

Cowan, Charles D., "Use of Statistical Analysis to Measure Damages", in <u>Comprehensive Guide to Economic Damages, Fourth Edition</u>, Business Valuation Resources, LLC, Portland, ME, April, 2016.  Revised and republished in Fifth Edition, 2018.  Revised and republished in Sixth Edition, 2021.

Cowan, Charles D., "Qui Custodiat Custodiens?", <u>International In-House Counsel Journal</u>, Cambridge, England, October 20, 2021.

---

Past Testimony, Charles D. Cowan

**Financial:**
MBIA v Credit Suisse. Worked for plaintiff.  Deposed in January 2016.  Trial in July 2019.

Christopher S. Porrino, Attorney General of New Jersey on behalf of Amy G. Kopleton, Deputy Chief of the New Jersey Bureau of Securities, v.  Credit Suisse Securities (USA) LLC, Credit Suisse First Boston Mortgage Securities Corp., and DLJ Mortgage Capital, Inc., Worked for plaintiff. Deposed in November 2018.

Federal Home Loan Bank of Boston v. Nomura; Federal Home Loan Bank of Boston v. Credit Suisse Securities (USA) LLC, Credit Suisse First Boston Mortgage Securities Corp., Worked for plaintiff. Deposed in January 2019, day 1, February 2019, day 2.

Financial Guaranty Insurance Company v. Morgan Stanley ABS Capital I Inc. and Morgan Stanley Mortgage Capital Holdings LLC, as successor to Morgan Stanley Mortgage Capital Inc., Worked for plaintiff.  Deposed in May 2019.

AMBAC Assurance Corporation et al v. First Franklin et al. Worked for plaintiff.   Deposed in December 2019.

FDIC v. First Horizon Asset Securities Et al. Worked for plaintiff. Deposed in April 2021.

AMBAC Assurance Corporation et al v. Nomura et al. Worked for plaintiff.  Deposed in May 2021.

**Financial - non RMBS**
Charles Baird and Lauren Slayton, as individuals, and on behalf of all others similarly situated, and on behalf of the BlackRock Retirement Savings Plan v. BlackRock Institutional Trust Company, N.A.; BlackRock, Inc.; The BlackRock, Inc. Retirement Committee; The Investment Committee of the Retirement Committee; The Administrative Committee of the Retirement Committee; The Management Development & Compensation Committee, Catherine Bolz, Chip Castille, Paige Dickow, Daniel A. Dunay, Jeffrey A. Smith; Anne Ackerley, Amy Engel, Nancy Everett, Joseph Feliciani Jr., Ann Marie Petach, Michael Fredericks, Corin Frost, Daniel Gamba, Kevin Holt, Chris Jones, Philippe Matsumoto, John Perlowski, Andy Phillips, Kurt Schansinger, Tom Skrobe; Kathleen Nedl, Marc Comerchero, Joel Davies, John Davis, Milan Lint, Laraine McKinnon, and Mercer Investment Consulting.  Worked for plaintiffs.  Deposed in May 2019.

**Disparate Impact \ Discrimination:**
River Cross Land Company, LLC v. Seminole County, FL.  Worked for plaintiff.  Deposition, Oct. 2019.

County of Cook v. Bank Of America Corporation.  Worked for plaintiff.  Deposition, February 2021.

County of Cook v. Wells Fargo Corporation.  Worked for plaintiff.  Deposition, November 2021.

**Construction Defects:**

Donald Melosh, et al. v. Western Pacific Housing, Inc., JAMS Case No.: 1100091610, Construction Defects.  Worked for defense. Deposition, March 2020.

**Other Cases:**

Pudlowski v. St. Louis Rams.  Worked for plaintiff.  Deposed in September 2017.  Deposed again in October 2018.

In Re: Dicamba Herbicides Litigation.  Worked for plaintiffs.  Deposition, March 2019.

Otter Products et al, v. Phone Rehab et al.   Worked for plaintiff.  Deposed in November 2019.

Thomas Allegra et al v. Luxottica Retail North America.  Worked for plaintiff.  Deposed Dec. 2019.

Westgate Resorts v. Reid Hein & Associates, dba Timeshare Exit Team.   Tortious Interference case.  Worked for plaintiffs.  Deposition, March 2020.

Charles Copley et al Bactolac Pharmaceutical, Inc. et al.  Worked for Plaintiffs, Deposed August 2020.

Mildred Clemmons et al v. Samsung Electronics of America, Inc.  Worked for plaintiffs. Deposed in October 2020.

Epic Tech, LLC v. Fusion Skill, Inc. et al.  Worked for defendant.  Deposition in Jan. 2021.

Jason R. Sheldon, Steven Hunsberger, et al. v. State Farm Mutual Automobile Insurance Company et al.  Worked for plaintiffs. Deposition in March 2021.

Office of the Attorney General, District of Columbia v. SCF Management, LLC and Jefferson 11th Street, LLC.  Worked for Plaintiff.  Deposition, April 2021.

Monster Energy Company v. Vital Pharmaceuticals, Inc. and John H. Owoc.  Worked for Plaintiff.  Deposition, June 2021.

In re:  Purdue Pharma et al, debtors.  Worked for West Virginia.  Deposition, July 2021. Hearing, August 2021.

District of Columbia v. Town Sports International, LLC. Worked for defendant.  Deposed in March 2022.

Brianna Arredondo et al. v. The University of La Verne.  Worked for plaintiffs.  Deposition, April 2022.

**Exhibit 3: Materials Relied On**

Case Documents

- Consolidated Class Action Complaint, dated September 1, 2020
- Dimitruyk Activity.pdf
- Dixon Activity.pdf
- Dimitryuk000031
- Dixon_Spring 2020 Course Credits
- AY 2019-2020 - Tuition and Fees Schedule - Revised 04-01-19.pdf
- #1 Spring 2020 Academic Calendar updated 3-20-2020
- #1 Spring 2020 Academic Calendar updated 4-6-2020 (002)
- #1 Spring 2020 Academic Calendar updated 9-16-2019 (002)
- Meeting Minutes 3.20.20
- https://bulletin.miami.edu/archives/2019-2020/
- Deposition of Jeffrey Duerk, PH.D., dated June 1, 2022

University of Miami Websites

- U-Miami's Fact Book 2019-20: https://irsa.miami.edu/_assets/pdf/fbfa2019.pdf
- https://web.archive.org/web/20200215013108/http://bulletin.miami.edu/undergraduate-academic-programs/continuing-international-education/bachelor-general-studies/
- https://bgs.dcie.miami.edu/_assets/pdf/bgs-brochure.pdf
- https://web.archive.org/web/20200407092729/https://bgs.dcie.miami.edu/prospective-students/tuition-and-financial-aid/index.html

Articles & Books

- Cutillo, L. (2019). Parametric and multivariate methods. Encyclopedia of Bioinformatics and Computational Biology, 738–746.
- Cochran, William H.  Sampling Techniques, 3rd Edition, John Wiley & Sons, New York, 1977.

Other Sources

- National Center for Education Statistics: https://nces.ed.gov/ipeds/

Other Websites

- https://web.archive.org/web/20200402031832/https://bschool.pepperdine.edu/admission/tuition/

- https://web.archive.org/web/20191121170954/http://www.bu.edu/online/programs/undergraduate-program/undergraduate-degree-completion-program/
- https://www1.villanova.edu/content/dam/villanova/provost/Catalogs/2019-21-ug-coursecatalog.pdf
- http://web.archive.org/web/20180412194827/http://www1.villanova.edu/villanova/professionalstudies/online.html
- https://web.archive.org/web/20190620205033/https://financialaid.gwu.edu/cost-of-attendance
- https://web.archive.org/web/20190620205033/https://financialaid.gwu.edu/cost-of-attendance
- https://web.archive.org/web/20190620205033/https://financialaid.gwu.edu/cost-of-attendance
- https://web.archive.org/web/20200416130614/https://online.gwu.edu/programs
- https://web.archive.org/web/20191009162947/https://online.drexel.edu/online-degrees/degrees.aspx
- https://web.archive.org/web/20200509175119/https://www.online.drexel.edu/online-degrees/arts-and-science-degrees/bs-communication/index.aspx#tuition
- https://web.archive.org/web/20200109163701/https://online.drexel.edu/online-degrees/nursing-degrees/bs-behavioral-health/index.aspx#tuition
- https://web.archive.org/web/20191009165221/https://online.drexel.edu/online-degrees/business-degrees/bs-ba/index.aspx#tuition
- https://web.archive.org/web/20200504125009/https://www.online.drexel.edu/online-degrees/business-degrees/bs-marketing/index.aspx#tuition
- https://web.archive.org/web/20200921145442/https://www.online.drexel.edu/online-degrees/arts-and-science-degrees/bs-crim-just/index.aspx#tuition
- https://web.archive.org/web/20200415165946/https://online.drexel.edu/online-degrees/bachelors-degrees/bs-gs-tech/index.aspx#tuition
- https://web.archive.org/web/20200415170045/https://online.drexel.edu/online-degrees/education-degrees/bs-ed/index.aspx#tuition
- https://web.archive.org/web/20200921144723/https://www.online.drexel.edu/online-degrees/education-degrees/bs-ed-noncert/index.aspx#tuition
- https://web.archive.org/web/20200413150745/https://online.drexel.edu/online-degrees/bachelors-degrees/bs-gs-mgmt/index.aspx#tuition
- https://web.archive.org/web/20190903121901/http://universitycollege.du.edu/bachelors/degree/bachelors/leadership-and-organization-studies/degreeid/308
- https://web.archive.org/web/20190827162658/https://www.du.edu/admission-aid/financial-aid-scholarships/undergraduate-financial-aid/price-and-affordability/cost-attendance
- http://web.archive.org/web/20200206152724/https:/lpsonline.sas.upenn.edu/tuition-aid/course-tuition

- http://web.archive.org/web/20200213144534/https://lpsonline.sas.upenn.edu/academics/bachelors-degree
- https://web.archive.org/web/20200314082750/https://www.sps.nyu.edu/homepage/admissions/tuition-and-fees/tuition-calculator-ug-bachelors-post-traditional-ft.html
- https://web.archive.org/web/20200314082906/https://www.sps.nyu.edu/homepage/admissions/tuition-and-fees/tuition-calculator-ug-bachelors-post-traditional-pt.html
- https://www.nyu.edu/students/student-information-and-resources/bills-payments-and-refunds/tuition-and-fees.html?currentOrProspective=current&enrollmentType=undergraduate&semester=Fall%202020&school=School%20of%20Professional%20Studies&credits=6&program=Division%20of%20Applied%20Undergraduate%20Studies
- https://web.archive.org/web/20191221031122/https://www.redlands.edu/online-programs/
- http://coursecatalog.syr.edu/content.php?catoid=17&navoid=2244
- https://bfas.syr.edu/wp-content/uploads/2019/06/2019-2020-Tuition-and-fees-booklet.pdf
- http://web.archive.org/web/20190410164850/https://parttime.syr.edu/students/online-learners/
- http://coursecatalog.syr.edu/content.php?catoid=17&navoid=2249
- https://web.archive.org/web/20190830041923/https://www.newschool.edu/tuition-fees-billing/current-tuition/
- https://www.newschool.edu/academic-catalog-2019-2020.pdf
- https://web.archive.org/web/20191001045505/https://www.american.edu/onlinelearning
- https://web.archive.org/web/20200926073526/https://online.pace.edu/undergraduate-programs/bs-professional-technology-studies/tuition-financial-aid/
- https://web.archive.org/web/20180628032136/http://www.pace.edu/admissions-aid/ipace-and-continuing-education/ipace-online-degree-completion-program/professional-communication-studies-bs
- https://www.pace.edu/sites/default/files/2021-03/2019-2020-undergraduate-catalog.pdf
- https://catalog.slu.edu/previous-catalogs/2019-2020/pdf/catalog2019-2020.pdf
- http://web.archive.org/web/20200117074409/http:/www.slu.edu/online/programs/index.php
- http://web.archive.org/web/20200116025803/https://www.luc.edu/bursar/tuitionfees/2019-2020/scps/
- http://web.archive.org/web/20210122061810/https://lucapps.luc.edu/online/course.htm?school=School%20of%20Continuing%20and%20Professional%20Studies

3

- https://www.luc.edu/bursar/tuitionfees/2019-2020/scps/
- http://web.archive.org/web/20200115043000/https://www.luc.edu/online/undergrad/rn-to-bsn/
- https://www.luc.edu/bursar/tuitionfees/2019-2020/rn-bsn/#d.en.558288
- http://web.archive.org/web/20200103182854/https:/www.luc.edu/online/index.shtml
- http://web.archive.org/web/20200115080608/https://www.luc.edu/adult-education/convenient-degree-options/online/index.shtml
- http://web.archive.org/web/20200411200633/https:/offices.depaul.edu/student-financial-accounts/cost-of-attendance/tuition/Pages/Tuition-Rates-2019-2020.aspx
- http://web.archive.org/web/20200411164816/https:/offices.depaul.edu/student-financial-accounts/cost-of-attendance/tuition/Pages/Continuing_and_Professional_Studies-Rates.aspx
- http://web.archive.org/web/20190428025357/https://www.depaul.edu/academics/online-learning/Pages/default.aspx
- https://web.archive.org/web/20170315064500/https://csh.depaul.edu/academics/psychology/undergraduate/Pages/online-program.aspx
- http://web.archive.org/web/20190406200805/https://communication.depaul.edu/academics/online-learning/Pages/default.aspx
- https://web.archive.org/web/20200928144819/https://www.depaul.edu/academics/undergraduate/majors/Pages/business-administration-baps.aspx
- https://web.archive.org/web/20201007183811/https://online.adelphi.edu/admissions/tuition-financial-aid/
- http://catalog.adelphi.edu/preview_program.php?catoid=11&poid=5109&returnto=576
- https://web.archive.org/web/20220401000000*/https://onlineprograms.adelphi.edu/programs/bs-bachelor-business/
- http://catalog.adelphi.edu/preview_program.php?catoid=11&poid=5139&hl=%22fully+online%22&returnto=search

Appendix 1.- University of Miami's Pricing Mechanism for Undergraduate Students

1.  Following the University of Miami's Fact Book 2019-2020,[1] the tuition rate for part-time undergraduate students (i.e., enrolled in 1-11 credit hours) was $2,100 per credit hour; the total tuition for full-time undergraduate students (i.e., enrolled in 12-20 credit hours) was $50,400 for the whole academic year, that is, $25,200 per semester; finally, the tuition rate for undergraduate students with overload (i.e., enrolled in more than 20 credit hours) was $2,100 for each credit hour above 20 hours.

2.  This tuition pricing mechanism on behalf of the University of Miami is summarized in the following formula, where HRS stands for enrolled credit hours:

$$\text{Total Tuition} = \begin{cases} \text{HRS} \times \$2,100 & \text{if} \quad 1 \leq \text{HRS} \leq 11 \\ \$25,200 & \text{if} \quad 12 \leq \text{HRS} \leq 20 \\ \$25,200 + [(\text{HRS} - 20) \times \$2,100] & \text{if} \quad 20 < \text{HRS} \end{cases}$$

3.  The University of Miami follows a non-linear tuition pricing mechanism because the tuition rate for each additional enrolled credit hour is not constant.  That is, each additional enrolled credit hour costs $2,100 but for enrolled credit hours 13th to 20th, which have an associated tuition rate of $0.

4.  Had the University of Miami followed a linear pricing mechanism with the stated rate of $1,200 per credit hour, the formula that summarizes such pricing mechanism follows:

$$\text{Total Tuition} = \text{HRS} \times \$2,100$$

---

[1] Available at  https://irsa.miami.edu/_assets/pdf/fbfa2019.pdf; last accessed on 6/13/2022.

Table A1.1 below displays the University of Miami's total tuition corresponding to different scenarios in terms of the number of enrolled credit hours, the tuition rate of the last enrolled credit hour in each scenario, and the total tuition had the University of Miami followed the linear pricing mechanism described above.

Table A1.1.- University of Miami's Non-linear Pricing Mechanism

| Num. Credit Hours | Total Tuition | Tuition Rate of Last Credit Hour | Linear Pricing |
|---|---|---|---|
| 1 | $2,100 | $2,100 | $2,100 |
| 2 | $4,200 | $2,100 | $4,200 |
| 3 | $6,300 | $2,100 | $6,300 |
| 4 | $8,400 | $2,100 | $8,400 |
| 5 | $10,500 | $2,100 | $10,500 |
| 6 | $12,600 | $2,100 | $12,600 |
| 7 | $14,700 | $2,100 | $14,700 |
| 8 | $16,800 | $2,100 | $16,800 |
| 9 | $18,900 | $2,100 | $18,900 |
| 10 | $21,000 | $2,100 | $21,000 |
| 11 | $23,100 | $2,100 | $23,100 |
| 12 | $25,200 | $2,100 | $25,200 |
| 13 | $25,200 | $0 | $27,300 |

| 14 | $25,200 | $0 | $29,400 |
| 15 | $25,200 | $0 | $31,500 |
| 16 | $25,200 | $0 | $33,600 |
| 17 | $25,200 | $0 | $35,700 |
| 18 | $25,200 | $0 | $37,800 |
| 19 | $25,200 | $0 | $39,900 |
| 20 | $25,200 | $0 | $42,000 |
| 21 | $27,300 | $2,100 | $44,100 |
| 22 | $29,400 | $2,100 | $46,200 |
| 23 | $31,500 | $2,100 | $48,300 |
| 24 | $33,600 | $2,100 | $50,400 |
| 25 | $35,700 | $2,100 | $52,500 |

5.   In turn, Figure A1.1 depicts the difference between the University of Miami's non-linear tuition pricing mechanism (black solid line) against the linear pricing mechanism (dotted gay line). Both mechanisms render the same total tuition when the number of enrolled credit hours falls in the range [1, 12], which are priced at $2,100 per credit hour.  Graphically, both lines lie on top of each other when the number of enrolled credit hours falls in the range [1, 12].  The University of Miami deviates from the linear pricing mechanism when it prices at $0 the 13th through the 20th enrolled credit hours.  Starting with the 21st enrolled credit hour, the University of Miami continues to price each additional credit hour at the rate of $2,100.  After the 20th enrolled credit hour, the shape (slope) of the solid black line is the same as the dotted gray line, however, the

dotted gray line lies above the solid black line by $16,800.  This is the total amount that the University of Miami did not receive for pricing eight credit hours, 13th through the 20th, at $0 rather than $2,100.  (That is, 8 × $2,100 = $16,800.)

Figure A1.1.- University of Miami's Total Tuition v. Linear Pricing



6.  On the other hand, Figure A1.2 shows the tuition rate for last credit hour in different scenarios in terms of the number of enrolled credit hours.  This figure shows that the University of Miami prices all credit hours at the same rate of $2,100, except for credit hours 13th through the 20th, which it prices at $0.

Figure A1.2.- Tuition Rate of the Last Credit Hour, University of Miami's Pricing Mechanism



7.  Consider three students, Robert, Rob, and Bob, who were enrolled in the University of Miami during Spring 2020.  Robert, Rob, and Bob, enrolled in nine, twenty, and twenty-four credit hours, respectively.  The University of Miami billed $18,900, $25,200, and $33,600 in total tuition to Robert, Rob, and Bob, respectively.  (See the figures in column "Total Tuition" in Table A1.1 associated to the values of 9, 20, and 24 in column "Num. Credit Hours".)

8.  Billing details for each of these three students follow.  Robert paid $2,100 for each of the nine credit hours he enrolled in.  That is, $9 \times \$2,100 = \$18,900$.  Rob paid $2,100 for each of the first twelve credit hours he enrolled in, and paid $0 for each of the remainder eight credit hours (13th through the 20th) he enrolled in.  That is, $(12 \times \$2,100) + (8 \times \$0) = \$16,800. = \$25,200$.  Bob paid $2,100 for each of the first twelve credit hours he enrolled in, paid $0 for each of the

eight credit hours from the 13th through the 20th he enrolled in, and paid $2,100 for each of the four credit hours from the 21st through the 24th he enrolled in.  That is, $(12 \times \$2,100) + (8 \times \$0) + (4 \times \$2,100) = \$33,600$.

9.   The pricing mechanism that the University of Miami follows is similar (in terms of its non-linear nature) to that of other higher education institutions per programs that offer on campus and in-person courses.  In contrast, regarding fully online (say) undergraduate programs, education institutions often offer a fixed tuition rate per academic credit hour (e.g., linear pricing mechanism).[2]

---

[2] See discussion in Appendix 2 regarding the tuition rates collected from schools that similarly situated as U-Miami that offer fully online undergraduate programs.

Appendix 2.- Methodology to Determine the Market Comparable Online Tuition Rate

1. This Appendix describes the methodology that I followed to determine the online tuition rate per credit hour that I used to calculate tuition-related damages.[1] Since U-Miami does not have a fully online undergraduate program, I rely on the online tuition rate associated with fully online undergraduate programs offered by higher education institutions that are similarly situated as U-Miami. This involved a two-step procedure, which I detailed below. However, I first present an overview of this procedure and the obtained results.

    A2.1.   Overview and Results.

2. In order to estimate the market comparable online tuition rate, first, I identified the set of schools that are similarly situated as U-Miami and have fully online undergraduate programs. Then, I searched for the tuition these schools charged for in their fully online undergraduate programs during Spring 2020 and, based on these collected data, I produced point and interval estimates of the market comparable online tuition rate.

3. As detailed below, I performed cluster analysis to identify the set of schools that are similarly situated as U-Miami using data for post-secondary education institutions that is available in the Postsecondary Education Data System (IPEDS) Survey, for the academic year 2019-2020. As a result, I obtained a list of 68 schools that are comparable to U-Miami. Table A2.1 shows this list of comparable schools. I should note that IPEDS also provides lists of comparable schools:

---

[1] See sections III.B, IV.A, IV.B, and V; in particular, the *Market_Online_Tuition* in ¶ 40.c.

(i) the U-Miami's self-declared list of comparable schools,[2] and (ii) the list of comparable schools produced by NCES.[3]

Table A2.1.  List of Schools Comparable to U-Miami.

| | | |
|---|---|---|
| Boston University | Carnegie Mellon University | Stanford University |
| New York University | Vanderbilt University | The Catholic University of America |
| George Washington University | California Institute of Technology | Chapman University |
| Syracuse University | Yale University | Loyola Marymount University |
| Drexel University | Georgetown University | Middlebury Institute of International Studies at Monterey |
| University of Pennsylvania | University of Chicago | University of the Pacific |
| Pepperdine University | Northwestern University | University of San Diego |
| University of Redlands | University of Notre Dame | University of San Francisco |
| University of Denver | Johns Hopkins University | Santa Clara University |
| American University | Boston College | Illinois Institute of Technology |
| DePaul University | Harvard University | Bentley University |
| Loyola University Chicago | Massachusetts Institute of Technology | Worcester Polytechnic Institute |
| Saint Louis University | Northeastern University | Stevens Institute of Technology |
| Adelphi University | Tufts University | Fordham University |
| The New School | Washington University in St Louis | Hofstra University |
| Pace University | Dartmouth College | Long Island University |

---

[2] IPEDS offers the "peer group defined by each institution" or "saved group" by academic year.  I retrieved the University of Miami's peer group, defined by the University of Miami itself for the AY 2019-2020, from the table 'CUSTOMCGIDS2019' using the UNITID 135726 that corresponds to this institution.

[3] IPEDS also offers the "automatic peer group developed by NCES" or "automatic group" by academic year. I retrieved the AY 2019-2020 University of Miami's automatic peer group from the table 'HD2019' where DFRCGID=99.  (That is, the comparison group 99 is the group that contains the University of Miami.)

| | | |
|---|---|---|
| Villanova University | Princeton University | New York Institute of Technology |
| University of Southern California | Columbia University in the City of New York | St John's University-New York |
| Emory University | Cornell University | Yeshiva University |
| Tulane University of Louisiana | Rensselaer Polytechnic Institute | Wake Forest University |
| Brandeis University | Duke University | Lehigh University |
| University of Rochester | Brown University | Southern Methodist University |
| Case Western Reserve University | Rice University | |

4. Notice that the list of comparable schools that I obtained via cluster analysis includes all of the 10 schools that U-Miami self-reported as comparable schools.[4]  Similarly, the list of comparable schools produced via cluster analysis contains all of the 36 schools that NCES considered as comparable to U-Miami.[5]

5. Out of the 68 comparable schools, 17 have at least one fully online undergraduate program according to IPEDS.[6]  I searched for the tuition rate associated to these programs during Spring 2020, which was reported on a per academic credit hour (ACH) basis for most of the schools.  Out

---

[4] Boston University, New York University, University of Southern California, Emory University, Tulane University of Louisiana, Brandeis University, University of Rochester, Case Western Reserve University, Carnegie Mellon University, Vanderbilt University.

[5] Boston University, New York University, George Washington University, Syracuse University, Drexel University, University of Pennsylvania, University of Southern California, Emory University, Tulane University of Louisiana, Brandeis University, University of Rochester, Case Western Reserve University, Carnegie Mellon University, Vanderbilt University, California Institute of Technology, Yale University, Georgetown University, University of Chicago, Northwestern University, University of Notre Dame, Johns Hopkins University, Boston College, Harvard University, Massachusetts Institute of Technology, Northeastern University, Tufts University, Washington University in St Louis, Dartmouth College, Princeton University, Columbia University in the City of New York, Cornell University, Rensselaer Polytechnic Institute, Duke University, Brown University, Rice University, Stanford University.

[6] I made this determination based on variable DSTNUGP in Table IC2019, which is described in IPEDS as: "A program for which all the required coursework for program completion is able to be completed via distance education courses."

of the 17 comparable schools, I found tuition information for 14 where 13 schools of them reported their tuition rate on a per ACH basis for their fully online academic programs.[7]  In order to get a better estimate of the market comparable tuition rate specifically for U-Miami during Spring 2020, I relied on the ratio estimate rather than the arithmetic mean, as detailed below (see A2.4).

Table A2.2.  Schools Comparable to U-Miami & With Fully Online Undergraduate Program.

| Institution | Average Undergraduate Tuition Cost (TUITION 2)[8] | Online Tuition Rate per ACH |
|---|---|---|
| Pepperdine University | 55,640.00 | 1,265.00 |
| Boston University | 54,720.00 | 480.00 |
| Villanova University | 54,550.00 | NA |
| George Washington University | 54,453.00 | 640.00 |
| Drexel University | 52,146.00 | 534.00 |
| University of Denver | 51,336.00 | 668.00 |
| University of Pennsylvania | 51,156.00 | 562.50 |
| New York University | 50,684.00 | 1990.62 |
| University of Redlands | 50,630.00 | NA |
| Syracuse University | 50,616.00 | 695.00 |
| University of Miami | 50,400.00 | |
| The New School | 49,770.00 | 1,335.00 |
| American University | 49,070.00 | NA |
| Pace University | 44,714.00 | 555.00 |
| Saint Louis University | 44,700.00 | 650.00 |
| Loyola University Chicago | 44,105.00 | NA |
| DePaul University | 40,551.00 | 655.00 |
| Adelphi University | 38,470.00 | 745.00 |

---

[7] NYU reported the online tuition costs of $12,787 for part-time AY2019-2020 including fees.  No separate fee value is available.  To remove fees from the figure, I subtract the percentage that fees account for based on the AY2020-2021 part-time tuition and fees data, which comes to 6.59474%.  So, the AY1019-2020 tuition cost for part-time (without fees) becomes $12,787*(1-0.0659474)=$11,943.73.  This is a flat semester rate for 6 to 10 credit hours.  I then calculate the average tuition per credit rate for part-time using 6 ACH.  Lastly, I select the highest average tuition rate between part-time and full-time.

[8] TUITION2 is reported in IPEDS in table IC2019 and described as: "In-state average tuition for full-time undergraduates."  TUITVARY identifies whether tuiton varies between in- and out-of-state.  Based on this variable, only University of Pennsylvania varies tuition in this manner.

6.    Table A2.2 displays the list of schools that are comparable to U-Miami and have a fully online undergraduate program, along with the corresponding data to calculate the market comparable online tuition rate for U-Miami during Spring 2020.

7.    Using all the information that is available, the resulting point-estimate of the ratio estimate is .01679.  In turn, the market comparable online tuition rate for U-Miami is $846.18.[9]  For comparison purposes, I should mention that the average of the online tuition rates reported in Table A2.2 is $819.15.  Also, while U-Miami does not have a fully only undergraduate program, it does offer the hybrid Bachelor of General Studies (BGS) program.[10]  The AY 2019-2020 tuition rate for the BGS program was $875.00 per ACH.[11]

8.    In addition to the point-estimates, I also present the ninety-five percent confidence interval-estimates of the ratio estimate and the market comparable online tuition rate (see A2.4).

A2.2. Cluster Analysis – Determination of Schools Comparable to U-Miami

9.    Cluster analysis is a statistical technique that is used to sort out the members in a population into mutually exclusive groups, so that the similarity within the groups are maximized.  The degree of similarity among members of the population is contingent upon a set of specified characteristics determined by the researcher.  The measure of these similarities, such as the distance function, varies by the specific clustering algorithm.[12]

---

[9] That is, .01679 × $50,400.

[10] This undergraduate program offers students "[t]he option to enroll in a blend of daytime, evening, weekend, and online classes." (See BGS' brochure, available online at https://bgs.dcie.miami.edu/_assets/pdf/bgs-brochure.pdf; last accessed on June 13, 2022.)

[11] https://web.archive.org/web/20200407092729/https://bgs.dcie.miami.edu/prospective-students/tuition-and-financial-aid/index.html; last accessed on July 7, 2022.

[12] Cutillo, L. (2019). Parametric and multivariate methods. Encyclopedia of Bioinformatics and Computational Biology, 738–746. https://doi.org/10.1016/b978-0-12-809633-8.20335-x

10. I performed cluster analysis to identify the set of schools that are similarly situated as U-Miami using the universe of institutions surveyed in the Integrated Postsecondary Education Data System (IPEDS)[13].   The completion of IPEDS surveys is mandatory for all institutions participating in any Federal financial assistance program authorized by Title IV of the Higher Education Act (HEA) of 1965.  Thus, this list is comprehensive with respect to Title IV schools. I use the IPEDS survey collection year 2019-2020[14].

11. However, this cluster analysis is applied to quantitative (e.g., tuition) rather than qualitative (e.g., whether a school is a "degree granting" institution or not) characteristics.   Thus, I complement the cluster analysis by filtering out institutions in IPEDS that are not comparable to U-Miami based on qualitative characteristics.   I only considered institutions that meet the following criteria:

- Located in the US fifty states

- With institutional level of "Four or more years"

- Is "Degree granting"

- Is a "Title IV postsecondary institution"

- Is not a University System Office

- The percent of undergraduate students enrolled exclusively in distance education courses is less than 100

- Has a Carnegie Classification 2018 Basic Code between and including 15 to 23[15]

- Has a Postbaccalaureate certificate or higher degree offering

---

[13] https://nces.ed.gov/ipeds/
[14] https://nces.ed.gov/ipeds/tablefiles/zipfiles/IPEDS_2019-20_Final.zip
[15] https://carnegieclassifications.acenet.edu/downloads/CCIHE2018-PublicDataFile.xlsx.   That is, from "Baccalaureate/Associate's Colleges: Mixed Baccalaureate/Associate's" (code 23) to "Doctoral Universities: Very High Research Activity" (code 15).

- Is a Private not-for-profit institution

12. I determined relevant quantitative characteristics to be considered for use in the cluster analysis, based on the following features associated to higher education institutions: cost of attending, enrollment, students' characteristics, attention paid to students, operation cost, regional factors, and distance education. I considered the available data in IPEDS and initially selected/created the quantitative variables displayed in Table A2.3.

Table A2.3. Initial Selection of Quantitative Characteristics for Cluster Analysis

| Institution – Feature | Variable – IPEDS and created(†) |
|---|---|
| cost of attending | chg2ay3, TUITION2, TUITION6 |
| enrollment | ENRTOT, PCTENFT$^{(†)}$,PCTEFUG$^{(†)}$ |
| students' characteristics | ADMCON7, PCTENRWH, RMINSTTP |
| attention paid to students | STUFACR |
| operation cost | SALTOTL |
| regional factors | Dist_Haversine$^{(†)}$ |
| distance education | PCTDEEXC, PCUDEEXC, PCGDEEXC, PCTALDE$^{(†)}$ |

13. The definition for each of the variables in Table A2.3 follows:

- chg2ay3 - Published in-state tuition and fees 2019-20.

- TUITION2 - In-state average tuition for full-time undergraduates.

- TUITION6 - In-state average tuition full-time graduates.

- ENRTOT - Total enrollment.

- PCTENFT – Percent of students enrolled Full-time. Calculated as (ENRFT[16] / ENRTOT).

---

[16] Full-time enrollment.

- PCTEFUG – Percent of students pursuing an Undergraduate degree. Calculated as (EFUG[17] / ENRTOT).

- ADMCON7 - Admission test scores.

- PCTENRWH - Percent of total enrollment that are White.

- RMINSTTP - Percent of first-time undergraduates - in-state.

- STUFACR - Student-to-faculty ratio.

- SALTOTL - Average salary equated to 9 months of full-time instructional staff - all ranks.

- Dist_Haversine – Calculated as the great-circle distance from University of Miami to the institution based on latitude and longitude.

- PCTDEEXC - Percent of students enrolled exclusively in distance education courses.

- PCUDEEXC - Percent of undergraduate students enrolled exclusively in distance education courses.

- PCGDEEXC - Percent of graduate students enrolled exclusively in distance education courses.

- PCTALDE - Percent of graduate students enrolled in any distance education courses. Calculated as (100 - PCTDENON[18]).

14. I asses the correlation matrix prior to filtering.  This is done because the limited range of the values in the filtered set results in lower apparent correlation.  Missing values are assessed post filtering.  Variables are removed based on a combination of missingness, multi-collinearity, and availability of alternate variables.  I removed the following variables: chg2ay3, TUITION6,

---

[17] Undergraduate enrollment.
[18] Percent of graduate students not enrolled in any distance education courses.

PCUDEEXC, PCGDEEXC, RMINSTTP, and ADMCON7. I removed variables confident that they have high collinearity with another variable that represents a similar dimension.

15. Next, I removed four institutions due to missing data as these cannot be used in the cluster analysis. The data is then standardized to provide consistent dimentionality across the characteristics for the distance function.

16. The remaining variables going into the cluster analysis are: TUITION2, PCTDEEXC, ENRTOT, PCTENRWH, STUFACR, SALTOTL, Dist_Haversine, PCTALDE, PCTENFT, and PCTEFUG.  I run a k-means clustering algorithm on the filtered and standardized dataset.

17. Using a within sum of squares (WSS) plot (Figure A2.1.), I use the Elbow Method to pick a suitable number of clusters. Five clusters meets the criteria of the Elbow Method, where the addition of another cluster has diminishing returns in reducing the WSS.  The results of the clustering are stored.  All institutions fall within one of the five clusters.  Cluster 3 contains U-Miami, and has a couple of cluster attributes to note.  First, the in-state average tuition for undergraduates (TUITION2) for Cluster 3 is, on average 1.59 standard deviations above the overall TUITON2 mean for the set of filtered institutions.  Second, the average 9 month salary for instructional staff (SALTOTL), is on average 2.25 standard deviations above the overall SALTOTL mean for the set of filtered institutions.

Figure A2.1.  Cluster Analysis, Within Groups Sum of Squares.



18. Cluster 3, now excluding U-Miami, is considered the list of comparable institutions to U-Miami.  (See Table A2.1.)  This list contains 68 institutions of which 49 institutions have undergraduate level distance education courses offered (DSTNUGC), and 17 have undergraduate level distance education programs offered (DSTNUGP), as reported in IPEDS.  These 17 institutions, plus U-Miami, are included in Table A2.2.

A2.3.   Collection of Tuition Rate Data.

19. For each of the 17 institutions with online undergraduate programs, I searched to find the online tuition rates for their fully online undergraduate programs.  Over the course of searching for these materials, I only source information from the institution's own website.  Published tuition

rates were found in archived catalogs/bulletins, and archived institutional webpages stored on the Internet Archive's Wayback Machine.[19]

20. In order to determine the online tuition rate of an institution, I used a methodology to apply consistently across all institutions. First, all fully online programs are identified and documented for the AY 2019-2020. Second, all applicable tuition rates are identified for each fully online program. To determine the online tuition rate for an institution with rates that vary across programs, the highest and most conservative value was selected as the representative value in calculating the market comparable online tuition rate.

21. Out of the 17 institutions searched, I found tuition rates for 14 of them (See Table A2.2) and, out of these 14, 13 schools reported tuition rates on a per ACH basis.

A2.4.   Calculation of Market Comparable Tuition Rate.

22. Using all the available data that was collected for the tuition rate for online undergraduate programs (Table A2.2), the estimated arithmetic mean is $819.15 with a 95% confidence interval of $575.42 and $1062.88 per credit hour, using the standard student's t distribution.

23. In order to get a better estimate of the market comparable tuition rate specifically for U-Miami, I start with calculating the ratio estimate[20] for the online tuition rates ($y_i$) and the average tuition cost TUITION2 ($x_i$) as:

$$\hat{R} = \frac{\sum y_i}{\sum x_i}$$

---

[19] https://web.archive.org/
[20] Cochran, William G. Chapter 6 In *Sampling techniques* (p. 150). John Wiley & Sons, 1977.

24. The corresponding 95% confidence interval for the ratio estimate is given by: [21]

$$\hat{R} \pm t_{\frac{\alpha}{2};n-1} * SE_{\hat{R}}$$

25. This ratio estimate ($\hat{R}$) is 0.01679. In the statistical software R, I use the svydesign() and svyratio() functions from the survey package to compute the standard error of the ratio estimate ($SE_{\hat{R}}$) used to calculate the confidence interval of the ratio estimate, which comes to 0.002280178. As a result, the corresponding 95% confidence interval for the ratio estimate is between 0.01186 and 0.02172.

26. Using this ratio, I estimated the market comparable online tuition rate for U-Miami by applying the ratio estimate to U-Miami's average tuition cost during AY 2019-20 (TUITION2).

$$\hat{R} * TUITION2_M = 0.01679 * \$50,400 = \$846.18/\text{credit hour}$$

27. I then scale the confidence interval for the ratio in the same manner. Doing this, I obtain the 95% confidence interval for the market comparable online tuition rate for U-Miami to be between $597.91 and $1094.45 per ACH.

---

[21] https://www.rdocumentation.org/packages/survey/versions/4.1-1/topics/svyratio